# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| AMANDA ABERNATHY, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:11-cv-03805-HGD |
| SCIENCE APPLICATIONS | ) | |
| INTERNATIONAL CORPORATION, | ) | |
| | ) | |
| DEFENDANT. | ) | |

_____

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

_____


Cynthia Forman Wilkinson
Wilkinson Law Firm, PC
215 North Richard Arrington Blvd.
Suite 811
Birmingham, AL  35203
(205) 250-7866


## I.    INTRODUCTION

In reading Defendant's Brief in Support of its Motion for Summary Judgment it was almost as if the Defendant was presenting alleged undisputed facts regarding another case. Plaintiff's response in opposition to Defendant's Motion for Summary Judgment tells the rest of the facts excluded by Defendant that shed light on and expose the discriminatory, harassing and retaliatory actions of Defendant's managerial employees.

## II.  PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF FACTS

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Admitted but further clarified. Bob Baker, Curriculum Manager, was required to change Plaintiff's title from Assistant Curriculum Manager to Senior Editor because the current contract with the government would not allow any assistant manager positions. (DEF Ex. A, Plaintiff Dep., p. 180).[1] The only change was Plaintiff's job title as Plaintiff continued to perform the duties of the Assistant Curriculum Manager and nothing else changed. (DEF Ex. A, Plaintiff Dep., p, 180-182, 184). However, when Robinson took over the Curriculum Department she

---

[1]To reduce the number of exhibits submitted to the court, Plaintiff has cited to the deposition exhibits submitted by Defendant.

demoted Plaintiff from Senior Editor to Editor. (DEF Ex. A, Plaintiff Dep., p. 180).

6.      Denied. Nothing changed but Plaintiff's job title and Plaintiff's pay was reduced, eleven months later in April 2010, because Robinson demoted Plaintiff and changed Plaintiff's evaluation scores to reflect lower scores than Plaintiff's immediate supervisor, Marcia Dickerson, had given Plaintiff. (DEF Ex. A, Plaintiff Dep., p. 180-182, 184, 185-186).

7.      Denied. (DEF Ex. A, Plaintiff's Dep., p. 185 -186).

8.      Admitted and further clarified. Plaintiff testified she was made aware of the issues during the April through June 2009 time period. (DEF Ex. A, Plaintiff's dep., p. 27-28). In the spring of 2009, Plaintiff was informed there were issues with the healthcare side of curriculum, some aspects of instructional systems design (DEF Ex. A, Plaintiff Dep., p. 38-39).

9.      Denied. Robinson started having some oversight for the Curriculum Department in April 2009, and in May and June of 2009, Robinson's oversight of the Department increased. (DEF Ex. A, Plaintiff's Dep., p. 27).

10.     Admitted.

11.     Denied. Sample was informed about issues in the Curriculum Department prior to May 25, 2009. (PL Ex. 1, Sample August 3, 2009 E-mail). The PIP issued to Bob Baker, Curriculum Manager, indicates Sample was made aware of these issues by the Government on May 22, 2009. (PL Ex. 2, Baker PIP). In addition,

Sample's email and the PIP does not support Defendant statement of fact that Sample were told about issues on May 25, 2009. Sample's e-mail states that he attended a curriculum meeting on May 25, 2009 and the PIP states that Sample shared concerns raised by the CDP Superintendent.

12.    Denied. Sample's e-mail and the PIP establish that Sample attended a curriculum meting on May 25, 2009, and discussed issues. (PL Ex. 1, Sample August 3, 2009 e-mail & PL Ex. 2, Baker PIP).

13.    Admitted. Baker was placed on a PIP only after management met with him three times, all documented in the PIP, to discuss issues. Baker was placed on a PIP only after there had been no improvement after three counseling sessions. (PL Ex. 2, Baker PIP).

14.    Admitted but immaterial.

15.    Admitted

16.    Denied. Sample testified Defendant received a letter from the Government in February 2010. The award fee was withheld from the Government around the time Sample was terminated in April 2010. (DEF Ex. D, Sample Dep., p. 35-37, 138-141). Sample testified the award fee was withheld around the end of Robinson's employment and close to the time Sample wanted to issue a written discipline to Robinson and Sample's immediate supervisor, Chuck Kelly, would not allow Sample to discipline Robinson for fear she might resign. (DEF Ex. D, Sample

Dep., p. 35, 138-141).

17.    Admitted.

18.    Admitted. However, Sample was upset with the entire department and all the writers and editors, not just Plaintiff. (DEF Ex. D, Sample Dep., p. 97-98). Sample never talked to Plaintiff about any errors or issues attributed to Plaintiff. (DEF Ex. D, Sample dep., p. 98).

19.    Denied. Robinson was already acting Curriculum Manager before Baker resigned. Robinson started having some oversight for the Curriculum Department in April 2009, and in May and June Robinson's oversight of the department increased. (DEF Ex. A, Plaintiff's Dep., p. 27).

20.    Admitted. However, Plaintiff and Farmer were the only employees who were pregnant in the Curriculum Department. The other employees that came in late were allowed to make up their time and work flextime. (DEF Ex. A, Plaintiff Dep., p. 56-57).  Allowing the salaried employees to work flextime or make up time was the standard practice as they had no set hours. (DEF Ex. D, Sample Dep., p. 67).

21.    Denied. Robinson had employees working seventy and eighty hours a week, and on some occasions working all night, without overtime. Around July 2009, Robinson chastised Plaintiff and Farmer in a group meeting of Curriculum Department employees and stated, "I am very impressed by all the people that are working these seventy - and eighty-hour work weeks. But there are two of you that

just have worked in the forties. That is not acceptable. We are going to have to get those hours up" (DEF Ex. A, PL p, 57-59

22.     Admitted. However, Plaintiff had a medical excuse stating she could only work 40 hours a week. (DEF Ex. A, Plaintiff's Dep., p. 56, 88-89, 117, 249, 334; & PL Ex. 3, Plaintiff's medical excuse). Breanna Farmer, who was also pregnant, had a medical excuse restricting her work hours to forty hours per week. (DEF Ex. A, Plaintiff's Dep., p. 56). Plaintiff understood Robinson's comment was directed at her and Farmer because they were pregnant and were physically unable to work the seventy and eighty hour work weeks Robinson required or spend all night working. (DEF Ex. A, Plaintiff's Dep., p. 94-95). Plaintiff was actually working forty-five to forty-six hours per week. (DEF Ex. A, Plaintiff's Dep., p. 57-58, 334).

23.     Denied. Robinson informed the whole department she expected them to work more than forty hours a week, and publically chastised Plaintiff and Farmer for not working seventy and eighty hours a week. (DEF Ex. A, Plaintiff's Dep., 56-58). Plaintiff was pregnant and close to the end of her pregnancy and obtained a medical excuse from her doctor limiting the number of hours she could work per week to forty. (DEF Ex. A, Plaintiff's Dep., p. 253-254). Plaintiff had the medical excuse at the time Robinson chastised her and Farmer for not working seventy and eighty hours a week. (DEF Ex. A, Plaintiff's Dep., p. 56, 253). Robinson's treatment of Plaintiff and Farmer caused Plaintiff not to give anyone a copy of her medical excuse. (DEF

Ex. A, Plaintiff Dep., p. 253).

24.     Admitted and further clarified. Plaintiff was afraid to give Robinson her doctor's excuse because of the Robinson's harassment and treatment of her. (DEF Ex. A, Plaintiff's Dep., p. 56, 249).

25.     Denied. No one else was on a PIP at the same time as Plaintiff. (DEF Ex. A, Plaintiff's Dep., p. 62-63, 86-87, 147, 265-266, 274-275, 314).

26.     Admitted and clarified. In Defendant's Exhibit B, 1, Watkins mentioned putting Plaintiff and others on a PIP but stated, "**That is, if they have ever been counseled for the shortfall and those have been documented**." Robinson had no such documents regarding Plaintiff. (Def Ex. H, Robinson Dep., p. 111-112).

27.     Denied. Lynn Rice was not issued a PIP because at the counseling session to go over her PIP it was determined Robinson had not documented some alleged counseling sessions and they were not part of the employee record. Rice did not understand that she had been counseled prior to the meting about the PIP.  As a result of the lack of documentation for prior counseling sessions Sample stopped the PIP from being issued to Rice. (DEF Ex. D, Sample Dep., p. 129-130).   Sample informed Rice that the PIP would be considered Rice's first counseling. (DEF Ex.D Sample Dep., p. 130-1310). Sample withdrew the PIP for Rice even though there had been some department meeting to discuss the issues alleged in Rice's PIP. (DEF Ex. D, Sample Dep., p. 131). Sample counseled Robinson for not documenting Rice's

alleged performance issues. (PL Ex. 4, Sample Dep., *Cummins v. SAIC,* p. 49*).* There is no documentation that Plaintiff was counseled prior to being issued the PIP and the PIP Plaintiff received does not document any counseling sessions with Plaintiff prior to being issued the PIP. Plaintiff's PIP only references prior Departmental meetings where issues were discussed with the whole department, not specifically Plaintiff. (PL Ex. 5, Plaintiff's PIP; & DEF Ex. D, Sample Dep., p. 97, 131). Sample testified Plaintiff PIP was not retracted like the PIP issued to Rice, because the issue was never brought to his attention. (DEF Ex. D, Sample Dep., p. 132).

Ward was not issued a PIP until November 16, 2009. (PL Ex. 6, Ward PIP). The PIP issued to Ward concerns different issues than those alleged in Plaintiff's PIP. Ward was issued a PIP for (1) attempting to circumvent her direct supervisor [Robinson]; (2) failure to use proper lines of communication; (3) poor staff relationships; (4) lack of attention to detail; (5) poor function management; and (6) inappropriate practice of tasking members of other departments to do Curriculum Department work.  (PL Ex. 6, Ward PIP). Farmer, the only other pregnant employee in the Curriculum Department, was going to be issued a PIP but did not return to work after her maternity leave. (Def Ex. A, Plaintiff's Dep., p. 62-63, 86-87, 265, ).

28.     Plaintiff admits the e-mail indicates drafts of some PIP's were circulated on August 4. 2009. However, these drafts have not been produced to Plaintiff and Plaintiff has no evidence that a PIP to be issued to Plaintiff was circulated on this

date. In addition, this is immaterial as Plaintiff was right at nine months pregnant at the time she was issued the PIP on August 13, 2009.

29.    Admitted, but Plaintiff was no longer a senior employee at the time she was issued a PIP and was an editor. Plaintiff had been demoted from Senior Editor to Editor. (DEF Ex. A, Plaintiff Dep., p. 180).

30.    Admitted and further clarified. In 2009, Plaintiff did not hear anyone discussing the possibility that the Curriculum contract with the government would be cancelled. (DEF Ex. A, Plaintiff Dep., p. 44). In addition, the issues raised by the customer, the Government, applied to all Curriculum Department employees and Plaintiff was the only person placed on a PIP at this time. Defendant has produced a PIP for Bob Baker issued in June 2009, (PL Ex. 2, Baker PIP), and Rosalie Ward issued in November 2009 (Pl Ex. 6, Ward PIP). No one else was placed on a PIP in June 2009, when Baker was issued his PIP. (DEF Ex. D, Sample Dep., p. 129). These individuals were not placed on a PIP at the same time as Plaintiff or for the same reasons. Caroline Robinson, Curriculum Manager, did attempt to place Lynn Rice, Editor, on a PIP. Rice was not placed on a PIP because there was no prior documentation that she had been disciplined prior to being placed on a PIP. (DEF Ex. D, Sample Dep., p. 130-131). Rice had made complaints to her supervisor, Marcia Dickerson, about Plaintiff being treated differently because of her pregnancy. (DEF Ex. G, Dickerson Dep., p. 45, 73-74). Rice was very vocal about the discriminatory

treatment of Plaintiff. (DEF Ex. G, Dickerson Dep., p. 74). Dickerson informed B J Jennings, Publications Manager located in Abingdon, Maryland, Rice had complained to her about Plaintiff being treated differently because of her pregnancy. (DEF Ex. G, Dickerson Dep., p. 81; DEF Ex. I, Jennings Dep., p. 8). Rice also complained to Dickerson that Robinson was attempting to retaliate against her. (DEF Ex. G, Dickerson Dep., p. 81-82). Unlike Plaintiff, who was placed on a PIP with no documentation she had been previously warned or counseled.

31.   Admitted. But the entire editorial and writing staff, a total of six employees, were not placed on PIPs.

32.   Denied. Churchey said if it were him he would not issue the PIPs. (PL Ex. 11, Churchey e-mail to Watkins). Churchey was also concerned about Abernathy being treated the same as other employees. (DEF Ex. C, Watkins Dep., p. 132).

33.   Denied. Watkins cited testimony does not support Defendant's alleged statement of fact.

34.   Admitted. However, Robinson was also present in the meeting when Plaintiff was given the PIP. (DEF Ex. C, Watkins Dep., p. 141). Bob Baker was still the Curriculum Manager when Plaintiff was issued the PIP on August 13, 2009, however Robinson, and not Baker, attended the meeting to present the PIP to Plaintiff. (PL Ex. 4, Sample Dep., 208, *Cummins v. SAIC).*

35.   Plaintiff admits the PIP issued to Plaintiff states, "Over the past two

months, SAIC management has shared with the **members of the Curriculum Department** concerns with the performance of the **department**. (PL Ex. 5, Plaintiff's PIP). However, Plaintiff denies that anyone spoke to her about any alleged performance issues or any alleged failure to edit products to acceptable standards. (DEF Ex. A, Plaintiff Dep., p. 150). In addition, Robinson would not let plaintiff edit and plaintiff no longer performed this duty. Plaintiff was not performing editing duties at the time she received the PIP, as this was not what she was assigned to do. (DEF Ex. A, Plaintiff dep., p.156).

36.    Denied. The PIP issued to Plaintiff does not cite any instance in which Plaintiff was counseled prior to being placed on a PIP. The PIP does reference conversations with the entire Curriculum Department about issues, but does not indicate what specific issues there were with Plaintiff's performance regarding these issues. (PL Ex. 5, Plaintiff's PIP; & DEF Ex. D, Sample Dep., p. 131). The PIP issued to Plaintiff references instances when the issues were shared with the **entire** Curriculum Department, but not any alleged specific issues related to Plaintiff. (PL Ex. 5, Plaintiff's PIP).

- "Over the past two months, SAIC management has shared with the **members of the curriculum department** concerns with the performance of the department." (PL Ex. 5, Plaintiff's PIP)(emphasis added).

- "The following are the specific examples of when management met with **department members**...(PL Ex. 5, Plaintiff's PIP).

- "On May 25, 2009, I shared that..." (PL Ex. 5, Plaintiff's PIP). The PIP issued to Plaintiff indicates that Sample had a meeting with "department members," which was the entire curriculum department, not Plaintiff, Sample testified he never had a meeting with Plaintiff to discuss any issues.

> Q.   Did you take Amanda Abernathy aside separate from that meeting with everybody and say, Amanda, sit down, I want to show you what you did wrong in this and I'm going to give you a counseling?
>
> A.   No.
>
> Q.   And Dr. Robinson -- there's nothing to indicate in Plaintiff's Exhibit 10 any date where Dr. Robinson sat down with Amanda Abernathy to discuss any performance issues, is there?
>
> A.   There doesn't appear to be one here. (DEF Ex. A, Sample Dep., p. 98).

- On June 15, 2009 after the submission of additional substandard curriculum manuals, I met with the **Curriculum Department** ..." (PL Ex. 5, Plaintiff's PIP).

Other serious issues regarding Robinson and her treatment of her employees are set forth in Watkins' April 12, 2010, E-mail to Peter Sellers. (PL Ex.22, Watkins April 12, 2010, E-mail to Sellers).

Watkins also prepared typed notes after counseling Robinson about these issues and documented the issues she discussed with Robinson. (PL Ex. 23, Watkins Typed Notes of Robinson Counseling). Watkins specifically counseled Robinson about her retaliation of employees, "That she retaliates against people." (PL Ex. 23, Watkins Typed Notes of Robinson Counseling).

Plaintiff's PIP does not list any date that any member of management counseled Plaintiff regarding these alleged errors prior to the date of the PIP. (DEF Ex. D, Sample Dep., p. 131). Plaintiff's PIP does not list any dates anyone counseled or disciplined Plaintiff and Sample, the Project Manager and the person who was supposedly issuing the PIP to Plaintiff, testified there are no dates listed in the PIP that reference Robinson's alleged meetings with Plaintiff. "I don't see reference to Dr. Robinson's meetings with Amanda Abernathy." (DEF Ex. D, Sample Dep., p. 97).

37.     Denied. Please see Plaintiff's response to No. 36.

38.     Denied. Defendant admits in its Brief, fn.8, Plaintiff contends she did not edit any of the projects referenced in the PIP. (DOC 21, p. 8). However, Defendant asserts, as an undisputed fact, that Plaintiff did edit the projects. The Instructional System Designers (ISD's) were directly under Robinson and were considered management employees. The ISD's made sure they had the final read over the curriculum materials.  (DEF Ex. A, Plaintiff dep., p.69, 123). Plaintiff was not the final read on any of the documents referenced in her PIP, and Plaintiff had evidence proving she was not the final read but was told it "didn't matter." (DEF Ex. A, Plaintiff dep., p.84-86, 104, 110, 114-116, 119, 121,). Robinson would not let plaintiff edit and plaintiff no longer performed this duty. Plaintiff was not performing editing duties at the time she received the PIP, as this was not what she was assigned to do. (DEF Ex. A, Plaintiff dep., p.125, 156). When Baker was the Curriculum

Manager, prior to Robinson's involvement with the Department, Plaintiff was the Assistant Curriculum Manager and then Senior Editor. (DEF Ex. A, Plaintiff Dep., p. 180).[2]

Defendant's fn. 8, also states that "Sample provided records in meetings reflecting that Abernathy worked on several of the projects." (DOC 21, p. 8). However, Defendant fails to cite any of Sample's testimony regarding this issue. This is because Sample does not know if there are any documents reflecting errors for Plaintiff, and he was never given any information about Plaintiff. (DEF Ex. D, Sample Dep., p. 134,163-164,  ). All Robinson did with regard to Plaintiff's PIP, was review it and sign it. (DEF Ex. D, Sample Dep., p. 164). The deposition page of Watkins' deposition, p. 304,  cited by Defendant do not support Defendant statement that Sample provided records.

39.    Admitted. However, when Robinson began managing the Curriculum Department she no longer allowed Plaintiff to edit. Robinson would not let plaintiff edit and plaintiff no longer performed this duty. Plaintiff was not performing editing duties at the time she received the PIP, as this was not what she was assigned to do. (DEF Ex. A, Plaintiff dep., p.156). Plaintiff's performance review was signed by

_____

[2]When Plaintiff was deposed counsel for Defendant argued with Plaintiff that the PIP issued to Plaintiff did not state Plaintiff was the final read.  (DEF Ex. A, Plaintiff dep., p.255). Defendant has asserted the opposite position in its Motion for Summary Judgment, and wants now allege Plaintiff placed on a PIP because she had final read.

Plaintiff on February 18, 2009, not March, and was completed when Plaintiff was still the Assistant Curriculum Manager, and Bob Baker was the reviewer. (PL Ex. 8, Plaintiff's February 2009 Evaluation). Plaintiff received am overall rating of 4 - Frequently Exceeds Expectations on her March 2009 evaluation. (PL Ex. 8, Plaintiff's February 2009 Evaluation).

40.     Denied. The evaluation referenced by Defendant is the Performance & development Review, Manager with Direct Reports, review completed by Bob Baker and presented to Plaintiff on February 18, 2009. (PL Ex. 8, Plaintiff's February 2009 Evaluation). At the time Plaintiff received this evaluation she was the Assistant Curriculum Manager. (PL Ex. 8, Plaintiff's February 2009 Evaluation, p. 1). Robinson began working with the Curriculum Department in prior to April 2009, and had responsibilities for the Department before officially taking over the Department in September 2009. PL Ex. 4, Sample Dep., p. 208, *Cummins v. SAIC*). Robinson demoted Plaintiff to an editor position, and Plaintiff no longer had the responsibility for final quality checks. (DEF Ex. A, Plaintiff Dep., p. 127; & DEF Ex. H, Robinson Dep., p. 54, 74-75, 121, 170-171). At the time Plaintiff was placed on a PIP, is undisputed Watkins, Robinson and Sample knew Plaintiff was only an editor. (DEF Ex. H, Robinson Dep., p. 42, 54, 121, 170-171; DEF Ex. C, Watkins Dep., p. 324). Plaintiff was never a lead editor when Robinson was over the department. (DEF Ex. H, Robinson Dep., p. 173).

41.     Denied. Defendant does not reference any testimony or evidence to support its allegation that Watkins received reports that Farmer and Abernathy had been disrespectful, in any manner, to Robinson in meetings. In addition, the testimony of Sample cited by Defendant does not make any reference to Watkins.

Plaintiff never rolled her eyes at Robinson. (Plaintiff Dep., p. 87, 261, 289). Plaintiff asked Robinson to tell her when she had ever disrespected her [Robinson] or rolled her eyes because she had never engaged in such conduct, and Robinson just replied, "I'm sorry." (DEF Ex. A, Plaintiff Dep. 87-88). Robinson also alleged and complained Farmer, the only other pregnant employee in the Department, was rolling her eyes. Robinson made this allegation about Farmer right before Farmer went out on maternity leave. (DEF Ex. A, Plaintiff Dep., p. 288-289).

Robinson testified Plaintiff allegedly rolled her eyes "When we would be discussing policies, goals, time lines, et cetera." (DEF Ex. H, Robinson Dep., p. 59). Robinson does not recall ever speaking to Plaintiff about Plaintiff allegedly rolling her eyes, nor does she recall anyone else discussing this alleged issue with Plaintiff. (DEF Ex. H, Robinson dep., p. 60).  In addition, the PIP issued to Plaintiff on August13, 2009, does not make any reference to any issues with Plaintiff rolling her eyes. (PL Ex. 5, Plaintiff's PIP). Robinson also never documented anything in Plaintiff's personnel file about Plaintiff allegedly rolling her eyes. (DEF Ex. H, Robinson Dep., p. 56).

In fact, Robinson does not deny that she may have rolled her eyes in the presence of employees or at employees and that there are times when it would be appropriate for her, the head of the Curriculum Department, to roll her eyes. (DEF Ex. H, Robinson Dep., p. 59). Robinson even testified, "I guess there's a context where that may be appropriate," referring to her rolling her eyes. (DEF Ex, H, Robinson Dep., p. 59).

Sample also never talked to Plaintiff about her alleged eye rolling. (DEF Ex. D, Sample Dep., p. 136).

42.     Denied. Plaintiff disputed that she had performed the work at issue in her PIP, on any of the listed projects. Plaintiff did work on some, but not all, of the projects, but not as alleged in her PIP. The PIP issued to Plaintiff indicated Plaintiff had editing issues with the HOT8, CSM, and HOT materials;  however, Plaintiff did not have any editing responsibility for this material and only worked on the matrix for these materials. (DEF Ex. A, Plaintiff Dep. p. 155-156). In addition, the PIPP issued to Plaintiff indicted Plaintiff had editing responsibility for the HEC and TERT materials, but Plaintiff did not work on these materials. (DEF Ex. A, Plaintiff Dep., p. 155). Plaintiff was not performing editing duties at the time she received the PIPP, as this was not what she was assigned to do. (DEF Ex. A, Plaintiff Dep., p. 156). Plaintiff did not fail to edit any courses because she was not asked or assigned to edit courses. (DEF Ex. A, Plaintiff Dep., p. 156-157).

43.    Denied. Plaintiff had documentation to prove that she did not commit the errors set forth in the PIP and Watkins and Robinson refused to look at the documents or even listen to Plaintiff's complaints about the PIP and the false allegations set forth therein. (DEF Ex. A, Plaintiff Dep., p. 84-86, 104, 107, 284, 265-266). Plaintiff even sent Watkins an e-mail on November 13, 2009, complaining to Watkins that she was forced to sign the Pip under duress because she was nine months pregnant and that the PIP was based on false information. (PL Ex. 9, Plaintiff's November 13, 2009 e-mail to Watkins). Watkins never investigated Plaintiff's complaint that the PIP was based on false information. (DEF Ex. C, Watkins Dep., p. 145). Watkins and Sample even determined Robinson was not a truthful person. (DEF Ex. C, Watkins dep., p. 26-28).

44.    Denied. The PIP issued to Plaintiff indicates Plaintiff had editing issues with the HOT8,  CSM , and HOT materials; however, Plaintiff did not have any editing responsibility for this material and only worked on the matrix for these materials. (DEF Ex. A, Plaintiff's Dep., p. 155-156). In addition, the PIP issued to Plaintiff  indicted Plaintiff had editing responsibility for the HEC and TERT materials, but Plaintiff did not work on these materials. (DEF Ex. A, Plaintiff's Dep., p. 155). Plaintiff was not performing editing duties at the time she received the PIP, as this was not what she was assigned to do. (DEF Ex. A, Plaintiff's Dep., p. 156). Plaintiff did not fail to edit any courses because she was not asked or assigned to edit

courses.. (DEF Ex. A, Plaintiff's dep., p. 156-157).

45.     Admitted.

46.     Admitted and further clarified. Defendant's statement is misleading. Plaintiff is not alleging that she complained to Jennings on August 14, 2012. Plaintiff testified in her deposition conducted on July 9, 2012, she had a conversation with BJ Jennings on August 14, 2009, and told Jennings about her PIP. (DEF Ex. A, Plaintiff Dep., p. 230, 282-284). Jennings was visiting the Curriculum Department to investigate complaints about Sample and Robinson. Plaintiff complained to Jennings that she turned in her FMLA papers on August 12, 2009 and the next day, August 13, 2009, she was given a PIP. Plaintiff told Jennings that she had been treated horribly since she became pregnant. Plaintiff also complained to Jennings that she had been told that she had to have perfect work. Jennings asked Plaintiff if anyone else was on a PIP and Plaintiff informed Jennings that she was the only one. Jennings told Plaintiff that was not fair and that she could not be held to a higher standard. (DEF Ex. A, Plaintiff's Dep., p. 291-292).

47.     Admitted but immaterial. Plaintiff's need for FMLA leave was obvious and known to all who could see Plaintiff, as Plaintiff was eight and a half months pregnant at the time she submitted her FMLA request. Unlike other reasons for FMLA leave that are not obvious, Plaintiff's leave was physically obvious so Sample, Watkins and Robinson were aware Plaintiff would need to take FMLA leave at some

point.

48.     Admitted.

49.     Admitted.

50.     Admitted but immaterial. Plaintiff's need for FMLA leave was obvious and known to all who could see Plaintiff as Plaintiff was pregnant. Unlike other reasons for FMLA leave that are not obvious, Plaintiff's leave was physically obvious so Sample, Watkins and Robinson were aware Plaintiff would need to take FMLA leave at some point.

51.     Denied. Robinson, Plaintiff and Lynn Rice were in a meeting and Robinson was in the process of interviewing applicants for positions in the Curriculum Department. Rice asked Robinson what type of questions she could ask in the interviews to make sure a good, capable person was hired. Robinson responded, looking directly at Plaintiff, "What, like if they have a baby?" (DEF Ex. A, Plaintiff's Dep.,  p. 95-96). In addition, On August 5, 2009, Robinson sent an email about employees working on projects over the weekend and stated in the email, "I understand that Breanna [Farmer] and Mandy [Plaintiff] have baby-related commitments over this weekend." (DEF Ex. A, Plaintiff's Dep., p. 110 & PL Ex. 10, Robinson's August 5, 2009 Email).

52.     Admitted.

53.     Admitted, however Defendant has failed to state all the issues Plaintiff

complained about in her November 13, 2009, e-mail exchange with Watkins. Plaintiff

complained about the PIP to Watkins on November 13, 2009;

> "That PIP was not fair to me. It was based on falsified information and also based on courses I did not read. That PIP was unfounded, as there were no standards to base it on. I signed it under duress as I was nine months pregnant and felt I did not have a choice at the time. I would like for the PIP to be retracted. I was going to address this upon my return, but I will come up there if I need to discuss this matter further." (PL Ex. 9, Plaintiff's November 13, 2009 e-mail chain between Plaintiff and Watkins).

Plaintiff was off on maternity leave and received an e-mail from Watkins about

an award fee bonus. Plaintiff did not receive her bonus so she emailed Watkins to

find out why. Watkins informed Plaintiff she did not receive her award fee bonus

because she was "placed on a PIP and it is on file." (PL Ex. 9, Watkins' November

13, 2009 e-mail chain between Plaintiff and Plaintiff).

54.     Admitted, however Defendant failed to provide the Court with all of

Plaintiff's complaints to Watkins on November 13, 2009, and that Watkins informed

Plaintiff, "We can discuss this when you return." in response to Plaintiff's complaints

in the email Watkins was responding to that Plaintiff was forced to sign the false PIP

under duress because she was nine months pregnant. (PL Ex. 9, Plaintiff's November

13, 2009 e-mail and e-mail chain between Plaintiff and Watkins).

55.     Denied. There was no written policy at SAIC stating an employee could

not receive the bonus if they were on a PIP. (DEF Ex. C, Watkins Dep., p. 525-526).

Watkins does not know if Plaintiff was ever informed of this policy. (DEF Ex. C, Watkins Dep., p. 528). In fact Watkins testified that it was not a policy "just information." (DEF Ex. C, Watkins Dep., p. 528).It was also not CDP policy. (DEF Ex. C, Watkins dep., p. 526). Sample testified that based on the performance evaluation Plaintiff received for the time period the bonus was to cover, Plaintiff should have received the bonus. (DEF Ex. D, Sample dep., p. 117). Sample further testified that once Plaintiff successfully completed her PIP she should have received her bonus. (DEF Ex. D, Sample Dep., p. 117).

56.    Denied. Watkins testified she has no knowledge of any other employees on a PIP who were denied a bonus at the same time as Plaintiff. (DEF Ex. D, Watkins Dep., p. 562). Watkins never investigated if any employee who did not receive a bonus while there were on a PIP, later received their bonus when they were no longer on a PIP. (DEF Ex. D, Watkins Dep., p. 562-565).

57.    Admitted and further clarified. On November 30, 2009, Sample summoned Plaintiff to his office first thing on her first day back from maternity leave. (DEF Ex. A, Plaintiff Dep., p. 230, 260-261). Sample never brought up the PIP issued to Plaintiff, but instead immediately informed Plaintiff he needed to talk to her about her attitude and accused Plaintiff of having a bad attitude. (DEF Ex. A, Plaintiff Dep., p. 261-262). Sample informed Plaintiff that Robinson reported to him that since Plaintiff and the other pregnant employee, Breanna Farmer, had been out on

maternity leave that attitudes had improved one hundred percent. (DEF Ex. A, Plaintiff Dep., p. 261). Sample told Plaintiff her attitude "better be on board as of today." (DEF Ex. A, Plaintiff Dep., p. 262). Sample also stated to Plaintiff, "I better not hear you say anything negative at all out of your mouth about Caroline [Robinson], about this department, or about any work done in this department, because, if you do, you won't work here anymore." (DEF Ex. A, Plaintiff Dep., p. 262-263).

58.      Denied. Defendant has misstated Plaintiff's testimony. Plaintiff testified Sample told her that the Curriculum Manager, Robinson, was the person who stated to him and claimed that since Plaintiff and Farmer had been out on maternity leave attitudes had improved. (DEF Ex. A, Plaintiff's Dep., p. 261-262). Defendant to correctly state that Robinson alleged that attitudes had gotten better and Defendant further failed to include the rest of Plaintiff's testimony about the fact that Robinson believed attitudes were better since Plaintiff and Farmer, the other pregnant employee, were out on maternity leave.(DEF Ex. A, Plaintiff Dep., p. 261-262).

59.      Denied. Sample told Plaintiff that Robinson was the person who alleged Plaintiff was rolling her eyes, had been negative and made negative comments, not that he had r"received reports." (DEF Ex. A, Plaintiff Dep., p. 262).

60.      Denied. When Plaintiff sent the November 13, 2009, e-mail to Watkins she was still on maternity leave, which is undisputed by Defendant. (Please see

Defendant's Statement of Facts No. 49, "Abernathy took maternity leave from August 26, 2009 to **November 30, 2009**." (emphasis added). Plaintiff testified she met with Sample the day she returned to work from maternity leave, which was November 30, 2009. Plaintiff did not send the November 13, 2009, e-mail "following" the meeting with Sample as Defendant has alleged. Watkins even testified Plaintiff sent the November 13, 2009, e-mail while Plaintiff was still on maternity leave. (DEF Ex. C, Watkins Dep., p. 307).

Again, Plaintiff sent an e-mail to Watkins on November 13, 2009, while she was still on maternity leave, complaining that she was forced to sign the PIP under duress because she was nine months pregnant and felt she did not have a choice. (PL Ex. 9, Plaintiff's November 13, 2009 e-mail and e-mail chain between Plaintiff and Watkins).

61.    Denied. Plaintiff requested documentation to prove the issues in the PIP and when Plaintiff met with Robinson and Watkins on December 4, 2009, Robinson said she forgot to bring the documents. (DEF Ex. A, Plaintiff Dep., p. 84, 264, 230). In addition, these documents were not sent to Watkins until well over three months after Plaintiff was placed on a PIP. Brian Churchey, Workplace Relations Director, instructed Watkins to include "specific information about the performance problems" and further informed Watkins, "Personally, I don't think I would be issuing the PIP's if it was me-" (PL Ex. 11, Churchey's August 11, 2009,  e-mail to Watkins & DEF

Ex. F, Sellers Dep., p. 102). When Watkins was discussing the PIP to be issued to Plaintiff she informed Churchey Plaintiff was pregnant. (DEF Ex. C, Watkins Dep., p. 132-133).

62.     Plaintiff admits that Robinson emailed Watkins documents on December 2, 2009. Plaintiff denies that these documents support Plaintiff being placed on a PIP. This e-mail was sent by Robinson after Plaintiff had been placed on the PIP. Plaintiff repeatedly asked Watkins, Sample and Robinson for the documentation to prove the issues asserted in the PIP. (DEF Ex. A, Plaintiff's Dep., 84-86, 163, 166-167, 332-333).

63.     Admitted.

64.     Admitted and further clarified. Plaintiff requested documentation to prove the issues in the PIP and Robinson said she forgot to bring the documents. (DEF Ex. A, Plaintiff Dep., p. 84, 264). Watkins told Plaintiff all she knew was that Plaintiff made some mistakes on a book that Plaintiff and another employee named Babette split. (DEF Ex. A, Plaintiff Dep., p. 264). Plaintiff asked to see the mistakes she made. (DEF Ex. A, Plaintiff's dep., p. 264). Plaintiff also asked if Babette made mistakes and Watkins and Robinson would not answer Plaintiff's question. (DEF Ex. A, Plaintiff Dep., p. 264-265). Watkins was supposed to know if there were other employees who were accused of the same issues and not placed on a PIP. Brian Churchey, Workplace Relations Director, instructed Watkins that she needed "to feel

comfortable and be sure that these PIP's are fair and that other employees in the department with similar performance issues are not being treated differently. For example if Abernathy files an ethics complaint and says that she is performing at the same level as Jane Doe, but Jane Doe didn't get a PIP – you need to be able to defend that." (PL Ex. 11, Churchey's August 11, 2009,  e-mail to Watkins).

65.      Admitted and further clarified. Defendant has again failed to include all of Plaintiff's testimony regarding her complaints to Watkins and Robinson in the December 4, 2009 meeting. Plaintiff asked Watkins and Robinson, "Well, how come I am the only pregnant person in the department and I am the only one that is on a PIPP?" (DEF Ex. A, Plaintiff's Dep., p. 265). Watkins responded and informed Plaintiff that she was not the only employee who was going to be placed on a PIP because Watkins had a PIP waiting for Breanna Farmer, the only other pregnant employee in the department. "Oh, no, you weren't the only one that was going to be on a PIPP. I had a PIPP waiting on Breanna, but she just didn't come back; she resigned. (DEF Ex. A, Plaintiff's Dep., p. 265). Plaintiff then complained she felt like she had been targeted unfairly and Plaintiff was told that was ridiculous. (DEF Ex. A, Plaintiff Dep., p. 265).

66.      Admitted.

67.      Denied. Sample testified that no one reported to him that Plaintiff was stating that her plan was to get fired and then sue SAIC. (DEF Ex. D, Sample Dep.,

p. 187). Nor did Sample testify that he and Watkins heard rumors that Plaintiff was plotting to get fired so that she could sue the company as defendant has alleged. The pages referenced by Defendant do not support Defendant's allegation that Sample and Watkins allegedly heard rumors in January 2010 or that Watkins heard any alleged rumors. Sample testified Watkins told him Plaintiff's plan was to get fired so she could sue the company. (DEF Ex. D. Sample Dep., p. 178). Sample further testified that he does not know where he heard the statement that Plaintiff was planning or plotting to get fired so she could sue the company. (DEF Ex. D, Sample Dep., p. 184, 188).

> Q.    You don't really know where it came from, do you?
>
> A,    No. (DEF Ex. D, Sample Dep., p. 179).

68.    Admitted.

69.    Denied. The testimony of Sample cited by Defendant does not support Defendant's alleged statement of fact that Plaintiff did not mention her pending EEOC charge to Sample or Watkins in this meeting. Sample testified he does not know if he was aware Plaintiff had a pending EEOC charge at the time he was questioning Plaintiff about weather or not she was plotting to get fired so she could sue the company. (DEF Ex. D, Sample Dep., p. 183). Sample testified that he should have been informed of Plaintiff's pending EEOC charge certainly before this meeting and when it was filed.(DEF Ex. D, Sample Dep., p. 187-188). Sample also testified

that no one ever questioned him about any information he may have had regarding the allegations set forth in Plaintiff's EEOC charge, despite the fact that Sample is specifically mentioned in Plaintiff's charge. (DEF Ex.D_, Sample Dep., p. 186-187).

70.    Denied. Sample testified on page 183 of his deposition that he did not know whether he had been informed of Plaintiff's EEOC charge at the time of the January 2010 meeting. (DEF Ex. D, Sample Dep., p. 183).

71.    Denied. Plaintiff first received an evaluation with a lower score because Robinson had changed the evaluation score to a "2" from the higher score  that had been given to Plaintiff by Marcia Dickerson, Plaintiff's immediate supervisor. (DEF Ex. A, Plaintiff's Dep., p. 268). The evaluation referenced by Defendant as Ex. 5 to Watkins Declaration is a corrected evaluation for Plaintiff because Plaintiff's scores were changed by Defendant to reflect the original scores given by Dickerson.

72.    Denied. Dickerson was assigned to evaluate four employees, Plaintiff and Lynn Rice were two of the employees. (DEF Ex. G, Dickerson Dep., p. 62-63). After Dickerson filled out the evaluations she gave them to Robinson. (DEF Ex. G, Dickerson Dep., p. 63). Dickerson felt Plaintiff's evaluatioin was a true reflection of her performance since the time Plaintiff had returned to work from maternity leave. (DEF Ex. G, Dickerson Dep., p. 64). Five was the highest score and employee could receive and one was the lowest. (DEF Ex. G, Dickerson Dep., p. 65). Dickerson did not give Plaintiff any 2's in any category. (DEF Ex. G, Dickerson dep., p. 65).

Dickerson gave Plaintiff mostly fours and some 3's in each category. (DEF Ex. G, Dickerson Dep., p. 65), Robinson told Dickerson that she could not evaluate employees above a certain number, which was a 3. (DEF Ex. G, Dickerson Dep., p. 65). Dickerson told Robinson that she did not agree with what Robinson was asking her to do, which was to provide lower ratings. (DEF Ex. G, Dickerson Dep., p. 66). Robinson gave Dickerson the evaluations back and instructed her to lower the scores. Dickerson gave Plaintiff all 3's, but felt she deserved higher ratings. (DEF Ex. G, Dickerson dep., 67). Dickerson met with Plaintiff and went over the evaluation she filled out for Plaintiff after Robinson instructed Dickerson to lower the scores. (DEF Ex. G, Dickerson Dep., p. 68-69). Plaintiff was upset with her evaluation scores and Dickerson was honest with Plaintiff and let Plaintiff know she had been instructed not to give a rating above a 3. (DEF Ex. G, Dickerson dep., p. 70-71). Dickerson later learned from Plaintiff that Robinson had changed Plaintiff's evaluation scores to even lower scores giving Plaintiff a 2 in some categories. (DEF Ex. G, Dickerson Dep., p. 68-70). Robinson did not discuss the change in Plaintiff's evaluation scores with Dickerson. (DEF Ex. G, Dickerson Dep., p. 71). Dickerson recalls that Robinson changed only the evaluations scores Dickerson had given Plaintiff and Lynn Rice. (DEF Ex. G, Dickerson Dep., p. 69-70). Dickerson complained to Paula Watkins, Human Resources Manager, about Robinson asking her to give lower evacuation scores. (DEF Ex. G, Dickerson Dep., p. 66, 71-72).Dickerson was not aware of

Watkins conducting any investigation into her complaints. (DEF Ex.G, Dickerson Dep., p. 73).

Sample testified that you were supposed to evaluate your direct reports and then all your manager would do is check over the evaluation, as the evaluator the appropriate questions and sign off on the evaluation. (PL Ex. 4, Sample Dep., *Cummins v. SAIC*, p. 164). The only contribution Robinson was supposed to have with regard to Plaintiff's evaluation was if she did not agree with the evaluation to talk it over with the evaluating manager. (PL Ex. 4, Sample Dep., *Cummins v. SAIC*, p. 166-167). Sample further testified that for Robinson to change the evaluation scores on Plaintiff's evaluation without consulting Dickerson was inappropriate. (PL Ex. 4, Sample Dep., *Cummins v. SAIC*, p. 166-167).

73.   Admitted and further clarified. Dickerson had supervised Plaintiff since Plaintiff's return from maternity leave. (DEF Ex. G, Dickerson Dep., p. 41,

74.   Denied. Dickerson originally gave Plaintiff mostly fours with a few three ratings. (DEF Ex. G, Dickerson Dep., p. 65). After Robinson instructed Dickerson that she could not give a rating over a 3 she gave Plaintiff all threes. (DEF Ex. G. Dickerson dep., p.  67).

75.   Denied as to Robinson being ultimately responsible for evaluating Plaintiff's performance. Plaintiff admits that Robinson changed Plaintiff's evaluation scores to lower ratings. Robinson gave the evaluations back to Dickerson to change

after Robinson instructed Dickerson she could not give an employee a rating over a 3. Dickerson then changed Plaintiff's evaluation scores and gave Plaintiff all 3's, and went over the evaluation with Plaintiff. After Dickerson met with Plaintiff and went over her evaluation, Robinson, without informing Dickerson, changed Plaintiff's evaluation scores to even lower scores giving Plaintiff an overall rating of a 2. (DEF Ex. G, Dickerson Dep., p. 68-70).

Sample testified that you were supposed to evaluate your direct reports and then all your manager would do is check over the evaluation, as the evaluator the appropriate questions and sign off on the evaluation. (PL Ex. 4, Sample Dep., *Cummins v. SAIC*, p. 164). The only contribution Robinson was supposed to have with regard to Plaintiff's evaluation was if she did not agree with the evaluation to talk it over with the evaluating manager. (PL Ex. 4, Sample Dep., *Cummins v. SAIC*, p. 166-167). Sample further testified that for Robinson to change the evaluation scores on Plaintiff's evaluation without consulting Dickerson was inappropriate. (PL Ex.4, Sample Dep., *Cummins v. SAIC*, p. 166-167).

76.    Admitted.

77.    Denied. Dickerson filed an ethics complaint because Robinson changed the evaluation scores for Plaintiff and Rice. Defendant later changed Plaintiff's evaluation scores to higher scores. (DEF Ex. G, Dickerson Dep., p. 75-77; & PL Ex. 12, Dickerson Ethics Complaint).

78.     Admitted.

79.     Admitted and further clarified. Dickerson also complained about Paula Watkins, Human Resources Manager, 'Please identify the person(s) engaged in this behavior: Ms. Caroline Robinson Ms. Paula Watkins." (PL Ex. 12, Dickerson Ethics Complaint, p. 5, bates #D-3269).

80.     Admitted.

81.     Admitted and further clarified. It was determined that Robinson lied about an alleged limit on evaluation scores. (DEF Ex.D, Sample Dep., p. 19, 48-49, 51, 58, 65-66, 89, 92-93,

82.     Admitted. However, Plaintiff's pay was decreased after the evaluation scores Robinson gave Plaintiff.

83.     Denied. Plaintiff's pay was reduced because Robinson demoted Plaintiff and gave Plaintiff a bad evaluation. (DEF Ex. A, Plaintiff's Dep., p. 131-132).

84.     Denied. Plaintiff's pay was reduced because Robinson demoted Plaintiff and gave Plaintiff a bad evaluation. (DEF Ex. A, Plaintiff's Dep., p. 131-132).

85.     Denied. Plaintiff's pay was reduced because Robinson demoted Plaintiff and gave Plaintiff a bad evaluation. (DEF Ex. A, Plaintiff's Dep., p. 131-132).

86.     Admitted.

87.     Admitted. However there were serious issues raised regarding Caroline Robinson, the Curriculum Manager, and Sample was aware of employee complaints

regarding Robinson. (PL Ex. 4, Sample dep., p. 55-56, *Cummins v. SAIC*). Robinson had been accused of sexual impropriety between January and April 2010, and she had been counseled about issues related to the February 2010 letter. (PL Ex. 4, Sample Dep., p. 80, *Cummins v. SAIC)*. After the February 2010 letter, Robinson was counseled more than one time about yelling at her employees. (PL Ex. 4, Sample Dep., p. 182-183, *Cummins v. SAIC)*. Sample wanted to place Robinson on a PIP during the time of the February 2010 letter. (PL Ex. 4, Sample Dep., p. 182-183, *Cummins v. SAIC)*. In fact, Sample was aware of some of the issues relating to Robinson raised in the February 2010 letter as early as January 2010, prior to receiving the February 2010 letter. (PL Ex. 4, Sample Dep., p. 206-207, *Cummins v. SAIC)*. In addition, Sample had counseled Robinson in December 2009 about not being in her department monitoring her employees. (PL Ex. 4, Sample Dep., p. 226, *Cummins v. SAIC)*.

88.    Denied. Jennings was investigating an ethics complaint filed by Dickerson against Robinson and Watkins, about Robinson changing the evaluation scores of Plaintiff and Lynn Rice. (DEF Ex. D, Sample dep., p. 176-177). Jennings went to Anniston to talk to employees prior to her visit with Hulsey. (DEF Ex. I, Jennings Dep., p. 16). Jennings visited the Anniston location in August 2009 by herself, and then again in April 2010, with Hulsey. (DEF Ex. I, Jennings Dep., p. 12, 16). Jill Matrosky, Human Resources Manager, asked Jennings to visit the Anniston

facility the first time, and do assessments. (DEF Ex. I, Jennings Dep., p. 12). The second visit, Tom Albro, Deputy Program Manager, and Dr. Ferriter, Program Manager. (DEF Ex. I, Jennings Dep., p. 12). Prior to Jennings visit in August 2009, she was informed that the client was unhappy with the work, and the teams or employees were frustrated, (DEF Ex. I, Jennings Dep., p. 13). When Jennings questioned employees in 2010, she was informed that there was no trust for on site Human Resources, which was Paula Watkins, and that Watkins was sharing information with others. (DEF Ex. I, p. 39-40). Jennings reported the complaints that Human Resources could not be trusted to Jill Matrosky, Human Resources Manager, and informed Matrosky that in addition to her report there were other issued that needed to be addressed. (DEF Ex. I, Jennings Dep., p. 41-52). In fact, when Jennings was visiting the Anniston facility IN August 2009, Watkins shared information with Jennings that Jennings testified should not have been shared with her. (DEF Ex. I, Jennings Dep., p. 42, 54). Watkins told Jennings that there were rumors Robinson was having an affair with Sample. (DEF Ex. I, Jennings Dep., p. 42-43).  Watkins also told Jennings that there was a rumor Robinson was having an affair with Ramon Nelson. (DEF Ex.I, Jennings Dep., p. 43-44; & DEF Ex. C, Watkins Dep., p. 457). Jennings reported to her Human Resources Manager, Jill Matrosky, that information was being shared with her that should not have been. (DEF Ex. I, Jennings Dep., p. 44-45). Jennings also informed Matrosky that there were ethical and unprofessional

situations at Anniston that needed to be addressed. (DEF Ex. I, Jennings Dep., p. 70). Jennings testified that if Robinson was having an affair with an employee it would be inappropriate conduct, but Jennings never reported this serious allegation and never investigated whether the rumors were true. (DEF Ex. I, Jennings, Dep., p. 49-50). Jennings was a member of the ethics committee for SAIC at the time she learned about the ethical and unprofessional conduct at Anniston. (DEF Ex. I, Jennings Dep., p. 74-75).

Jennings visited the Anniston April 10 - 12, 2010. (DEF Ex. I, Jennings Dep., p. 66). Jennings had knowledge of serious concerns, in part, that Robinson was threatening and intimidating her employees. (DEF Ex. I, Jennings Dep., p. 128-130; & PL Ex. 7, Jennings' Notes).

89.    Admitted. However, Jennings made handwritten notes after her meeting with employees. Jennings notes and conversations with the Curriculum employees document numerous serious complaints about Robinson, one being that Robinson threatened and intimidated her employees.  (DEF Ex. I, Jennings Dep., p. 128-130; & PL Ex. 7, Jennings' Notes). These complaints about Robinson are not in the assessment report but Jennings verbally reported these complaints to Sample, Kelly and Watkins in a close out meeting. (DEF Ex. I, Jennings Dep., p. 131).  Jennings was also aware when she and Hulsey visited Anniston in April 2010, that Dickerson, Plaintiff's supervisor, had made a complaint to SAIC's ethics line and complained

that Robinson retaliated. (DEF Ex. I, Jennings Dep., p. 133).

90.    Denied.  Jennings learned during the assessment that there were serious ethical concerns regarding Robinson's treatment of her employees. (DEF Ex. I, Jennings Dep., p. 151). Jennings also had employees report to her that Robinson threatened employees, Robinson was out of control and employees did not trust Human Resources. (DEF Ex. I, Jennings Dep., p. 151-152). However, these serious ethical concerns regarding Robinson are not included in the assessment report. (DEF Ex. I, Jennings Dep., p. 151-152).

91.    Admitted, but immaterial. However, Jennings ignored the serious unprofessional and unethical issues reported to her during her visits to Anniston. (DEF Ex. I, Jennings Dep., p. 49-50, 128-130; & PL Ex. 7, Jennings' Notes).

92.    Admitted, but immaterial.

93.    Plaintiff admits Hulsey testified as cited, but this testimony is immaterial and  irrelevant.

94.    Admitted in part and denied in part. Dickerson complained to Jennings that morale was low and attributed part of this issue to Robinson. Dickerson and other employees were given unrealistic deadlines agreed to by Robinson, and then told by Robinson that if they did not produce they would loose the contract or loose their jobs. (DEF Ex. G, Dickerson Dep., p. 28-30). Dickerson also complained to Jennings that Robinson had a complete lack of respect for the employees. (DEF Ex. G,

Dickerson Dep., p. 31).

Jennings had knowledge of serious concerns, in part, that Robinson was threatening and intimidating her employees. (DEF Ex. I, Jennings Dep., p. 128-130; & PL Ex. 7, Jennings' Notes). Jennings also had employees report to her that Robinson threatened employees, Robinson was out of control and employees did not trust Human Resources. (DEF Ex. I, Jennings Dep., p. 151-152).

Jennings talked with Plaintiff when she visited Anniston, and Plaintiff complained that morale was low because there was no praise or worthy feedback given to employees. (DEF Ex. I, Jennings Dep., p. 32).

Jennings also testified that if there was talk among the Curriculum employees that Robinson was having an affair with Sample, or any other employees that would impact morale. (DEF Ex. I, Jennings Dep., p. 55). Watkins told Jennings that there were rumors Robinson was having an affair with Sample. (DEF Ex. I, Jennings Dep., p. 42-43).  Watkins also told Jennings that there was a rumor Robinson was having an affair with Ramon Nelson. (DEF Ex.I, Jennings Dep., p. 43-44).

95.    Admitted.

96.    Denied. The termination letter given to Sample when he was terminated indicates he was being terminated due to performance issues. (DEF Ex. D, Sample Dep., p. 35-37, & PL Ex. 13, Sample Termination Letter).

97.    Denied. Sample testified he was told he was being terminated because

it was in the best interest of SAIC due to the relationship with the Government and progress in the Curriculum Department. (DEF Ex. D, Sample Dep., p. 24). The termination letter given to Sample when he was terminated indicates he was being terminated due to performance issues. (DEF Ex. D, Sample Dep., p. 35-37, & PL Ex.13, Sample Termination Letter).

98.    Admitted, however Plaintiff testified that her supervisor, Marcia Dickerson, participated in the conversation.

99.    Admitted.

100.    Admitted.

101.    Admitted and further clarified. However, Plaintiff did not apply because she heard Marcia Dickerson, her current supervisor, an employee named Charles and an ISD talking about a replacement for Dickerson because she was leaving. Plaintiff's name was mentioned as a replacement for Dickerson but the statement was made by the ISD, "but she's put on a PIP and that just wouldn't look good." The ISD also said, the government knows, and they probably just wouldn't like it." (DEF Ex. A, Plaintiff Dep., p. 237-238).

102.    Admitted. However, Plaintiff did not apply because she heard Marcia Dickerson, her current supervisor, an employee named Charles and an ISD talking about a replacement for Dickerson because she was leaving. Plaintiff's name was mentioned as a replacement for Dickerson but the statement was made by the ISD,

"but she's put on a PIP and that just wouldn't look good." The ISD also said, the government knows, and they probably just wouldn't like it." (DEF Ex. A, Plaintiff Dep., p. 237-238).

103.   Admitted.

104.   Admitted. However, Plaintiff heard Marcia Dickerson, her current supervisor, an employee named Charles and an ISD talking about a replacement for Dickerson because she was leaving. Plaintiff's name was mentioned as a replacement for Dickerson but the statement was made by the ISD, "but she's put on a PIP and that just wouldn't look good." The ISD also said, the government knows, and they probably just wouldn't like it." (DEF Ex. A, Plaintiff Dep., p. 237-238).

105.   Admitted.

106.   Denied. Robinson made the decision to turn Plaintiff's office into the library and move Plaintiff to the storage closet, "Mandy knows that decision was made by Caroline [Robinson]". (PL Ex. 14, Watkins May 30, 2010 E-mail) Watkins was involved in investigating complaints about Plaintiff's office being taken away and placing Plaintiff in a storage closet. Watkins determined that placing Plaintiff in a storage closet could be viewed as retaliation and that everyone was aware Robinson was the person who made the decision to take Plaintiff's office and move Plaintiff to a storage closet, "Mandy knows that decision was made by Caroline [Robinson]". (PL Ex. 14, Watkins May 30, 2010 E-mail)

107.   Plaintiff admits that her office was one of the larger offices, but there were other large offices and Plaintiff's office was not the largest. (DEF Ex. A, Plaintiff Dep., p. 218-219). There were also several empty offices. (DEF Ex. A, Plaintiff Dep., p. 222).

108.   Admitted.

109.   Denied. Robinson made the decision to move Plaintiff to the storage closet, "Mandy knows that decision was made by Caroline [Robinson]". (PL Ex. 14, Watkins May 30, 2010 E-mail).

110.   Admitted.

111.   Admitted.

112.   Admitted. However the decision to take Plaintiff's office away was made by Robinson in 2009, while Plaintiff was on maternity leave. (PL Ex. 14, Watkins May 30, 2010 E-mail; & DEF Ex. A, Plaintiff Dep., p. 218, 223-224, 257-258).

113.   Plaintiff admits that she was originally assigned to move to a storage closet, that was also referred to as the  "ghost room." (DEF Ex. A, Plaintiff Dep., p. 220). Robinson made the decision to move Plaintiff to the storage closet, "Mandy knows that decision was made by Caroline [Robinson]". (PL Ex. 14, Watkins May 30, 2010 E-mail). Watkins, Human resources Manager, determined that it could be construed as retaliatory to move an employee's office  to a storage closet. (PL Ex. 14, Watkins May 30, 2010 E-mail). The decision to move Plaintiff to a storage close was

made by Robinson while Plaintiff was still on maternity leave. (DEF Ex. A, Plaintiff Dep., p. 218, 223-224, 257-258.) Watkins sent an e-mail on May 28, 2010 to Chuck Kelly, about moving Plaintiff into the storage closet and stated the decision to move Plaintiff was made in November 2009. (PL Ex. 15, Watkins May 28, 2010 E-Mail). Marcia Dickerson, Plaintiff's immediate supervisor, had a conversation with Paula Watkins, Human Resources Manager, about Plaintiff's office being moved to a storage closet and Watkins said it seemed Robinson was being retaliatory. (DEF Ex. G, Dickerson Dep., p. 159-160).

114.    Admitted. Plaintiff did not want to move to this particular office because it was a storage closet. Watkins even determined that Robinson moving Plaintiff to the storage closet could be viewed as retaliatory. (PL Ex. 14, Watkins May 30, 2010 E-mail).

115.    Denied. Watkins determined it would be retaliatory to move Plaintiff to the storage closet. Robinson made the decision to move Plaintiff to the storage closet, "Mandy knows that decision was made by Caroline [Robinson]". (PL Ex. 14, Watkins May 30, 2010 E-mail). Watkins, Human resources Manager, determined that it could be construed as retaliatory to move an employee's office  to a storage closet. (PL Ex. 14, Watkins May 30, 2010 E-mail).

116.    Admitted and further clarified in Watkins' emails attached as PL Ex. 14, Watkins May 30, 2010 E-mail; & PL Ex. 15, Watkins May 28, 2010 E-mail).

117.    Admitted.

118.    Admitted and further clarified. Plaintiff talked to Joe Perkell and he told Plaintiff that it would not look good to ask the Government for a change since Robinson made the decision and they had previously asked the Government for so many other things like delays and deadline changes. Perkell also told Plaintiff he did not want to add fuel to the fire and asked Plaintiff if she would agree to move her office, and Plaintiff agreed. (DEF Ex. A, Plaintiff Dep., p. 246).

## II.    PLAINTIFF'S STATEMENT OF FACTS

### A.    PLAINTIFF'S EMPLOYMENT WITH DEFENDANT

1.    Amanda Abernathy worked for SAIC for approximately six years and two years with EAI before SAIC bought EAI. (DEF Ex. A, Plaintiff dep., p. 10-11).

2.    Plaintiff was promoted to the position of Assistant Curriculum Manager, however, Defendant later had a contract that required Plaintiff's job title be changed from Assistant Curriculum Manager to senior editor. (DEF Ex. A, Plaintiff Dep., p. p. 11-12).

3.    Plaintiff worked in the building 61 side of the Curriculum Department business and there was also the health care side of the Curriculum Department. (DEF Ex. A, Plaintiff dep., p. 16).

4.    Frank Troha, Manager of Development, was employed at the Anniston facility, after Robinson was terminated, and observed Plaintiff work performance

which he describes as good. (PL Ex. 26, Troha Dep., p. 58).

5.      Troha never had a problem with Plaintiff and she worked hard. (PL Ex. 26, Troha Dep., p. 64).

**B.      CURRICULUM DEPARTMENT MANAGER CAROLINE ROBINSON**

6.      Caroline Robinson was the Curriculum Manager for approximately one year, until she was terminated on April 15, 2010. (DEF Ex. A, Plaintiff Dep., p. 25; & PL Ex. 16, Robinson Termination Letter).

7.      Bob Baker was the Curriculum Manager before Robinson and he had the primary responsibility for the healthcare side of Curriculum. (DEF Ex. A, Plaintiff Dep., p. 26-27).

8.      While Baker was still the Curriculum Manager Robinson started having major oversight over the Curriculum Department. (DEF Ex. A, Plaintiff Dep., p. 27, 50-51).

9.      Robinson started having some oversight for the Curriculum Department prior to April 2009, but Robinson began working with the Curriculum Department prior to April 2009. (DEF Ex. A, Plaintiff Dep., p. 50-51).

10.     Then Project Manager, Jim Sample, announced that Robinson was taking over the management and oversight of the Curriculum Department he informed the Department they were to answer to noone but Robinson. (DEF Ex. A, Plaintiff Dep., p. 54).

11.     Once Robinson took over the Curriculum Department she and the instructional systems designers, ("ISD's), had responsibility for eliminating errors from the submissions to the government. (DEF Ex. A, Plaintiff Dep., p. 99).

12.     During the time Caroline Robinson was the Curriculum Manager, the Curriculum Department was placed on probation. (DEF Ex. A, Plaintiff Dep., p. 25).

13.     Beginning in February 2010, Sample testified things had gotten steadily worse with Robinson and he and Watkins became aware of issues regarding Robinson that gave them concern as to whether or not Robinson could continue in her position as Curriculum Manager. (DEF Ex. D, Sample Dep., p. 43).

14.     Sample and Watkins became aware of complaints about Robinson that were founded. (DEF Ex. D, Sample Dep., p. 43; & PL Ex. 17, Watkins May 4, 2010 E-mail).

15.     Sample and Watkins determined that Robinson lied to the Curriculum Department about the scores she was allowed to give an employee on a performance review and told the department Sample would not allow her to give a score above a certain number. (DEF Ex. C, Watkins Dep., p. 316-318; PL Ex. 17, Watkins May 4, 2010 E-mail; & PL Ex. 18, Watkins' May 3, 2010 Notes).

16.     Sample had issues with Robinson "freezing out the staff." (DEF Ex. C, Watkins Dep., p. 31; PL Ex. 17, Watkins May 4, 2010 E-mail; PL Ex. 18, Watkins' May 3, 2010 Notes).

17.     Sample verbally counseled Robinson about there being a breach of trust with regard to Robinson. (DEF Ex. Watkins Dep., p. 317; PL Ex. 17, Watkins May 4, 2010 E-mail; PL Ex. 18, Watkins' May 3, 2010 Notes).

18.     Sample verbally counseled Robinson about her yelling at employees. (DEF Ex. C, Watkins Dep., p. 317-318; PL Ex. 17, Watkins May 4, 2010 E-mail; PL Ex. 18, Watkins' May 3, 2010 Notes).

19.     Sample verbally counseled Robinson about tensions being high in the Curriculum Department. (DEF Ex. C, Watkins Dep., p. 317; PL Ex. 17, Watkins May 4, 2010 E-mail; PL Ex. 18, Watkins' May 3, 2010 Notes).

20.     Sample complained that Robinson "engendered misrepresentations about their relationship. (DEF Ex. C, Watkins Dep., p. 320; PL Ex. 17, Watkins May 4, 2010 E-mail; PL Ex. 18, Watkins' May 3, 2010 Notes).

21.     Sample believed Robinson had questionable ethics. (DEF Ex. C, Watkins Dep., p. 321; PL Ex. 17, Watkins May 4, 2010 E-mail; PL Ex. 18, Watkins' May 3, 2010 Notes).

22.     Watkins counseled Robinson about "speaking unkindly and disrespectfully to her staff." (DEF Ex. C, Watkins dep., p. 439).

23.     Watkins counseled Robinson about retaliating against employees and told Robinson that she retaliated against employees. (DEF Ex. Cm Watkins Dep., p. 440).

24.     Employees complained that Robinson was having an affair with Sample. (DEF Ex. C, Watkins Dep., p. 440-443; PL Ex. 18, Watkins May 3, 2010 Notes).

25.     There were also complaints Robinson was having a sexual relationship with Ramon Nelson, Jim Sample, and Keith Gurlides. (DEF Ex. C, Watkins Dep., p. 444-446).

26.     Watkins even told Jennings that there were rumors Robinson was having an affair with Sample. (DEF Ex. I, Jennings Dep., p. 42-43).

27.     Watkins also told Jennings that there was a rumor Robinson was having an affair with Ramon Nelson. (DEF Ex.I, Jennings Dep., p. 43-44). Ann Mitchell reported to Watkins that there was talk that Robinson was caught on camera performing oral sex on Gurlides. (DEF Ex. C, Watkins Dep., p. 389).

28.     Robinson admits she had an affair with Keith Gurlides, a subcontractor working with SAIC. (PL Ex. 21, Robinson Dep., p. 128, 133, 136, *Cummins v. SAIC).*

29.     Robinson admits she engaged in sexual acts with Gurlides on SAIC property or the property of the Government. (PL Ex. 21, Robinson Dep., p. 133, *Cummins v. SAIC).*

Q.     Have you ever engaged in any sex acts on the premises of SAIC or the government contractors' property with any employee, and that includes the parking lot,  stairwell, anything on the outside grounds?
A.     Any employee, no.
Q.     With anybody?
A.     Probably Keith.
Q.     And where do you believe that you and Keith engaged in sex acts?

A.      In sex acts, do you want to define those for me?

Q.      Anything related to any physical touching that -- any touching of the genitals, any kissing, anything --

A.      In the parking lot. (PL Ex. 21, Robinson Dep., p. 133, *Cummins v. SAIC)*.

30.      Robinson engaged in other sexual acts with Gurlides, specifically, oral sex.

Q.      But you did have sexual intercourse with Keith or engage in some sexual act?

A.      Yes.

Q.      Did that include intercourse or was it oral sex or --

A.      Oral sex. (PL Ex. 21, Robinson Dep., p. 142, *Cummins v. SAIC)*.

31.      Robinson testified Watkins, nor anyone else, ever questioned her about an affair with Gurlides, but that Watkins told her it was a concern and never asked Robinson for a response. (PL Ex. 21, Robinson Dep., p. 136, *Cummins v. SAIC)*.

32.      However, Watkins received complaints that Robinson was caught on camera performing oral sex on Gurlides. (DEF Ex. C, Plaintiff Dep., p. 389).

33.      Robinson was never asked by Watkins if she had a sexual relationship with Sample or Ramon Nelson. (PL Ex. 21, Robinson Dep., p. 147, *Cummins v. SAIC)*.

34.      During January, February and March, management met with Robinson on multiple occasions to address their concerns with her effectively managing the department and her treatment of the employees got worse, which was confirmed by

the ongoing continuing complaints being raised and another sensing session conducted by HR, also revealed that Robinson was demonstrating retaliatory behavior towards staff for voicing their concerns. (PL Ex. 23, Watkins Typed Notes of Robinson Counseling).

35.    In January 2010, Sample sent Watkins to talk with the Curriculum Department employees, and Watkins later learned that the employees suffered the consequences for having talked to Human Resources. (PL Ex. 22, Watkins April 12, 2010, E-mail to Sellers).

36.    Watkins determined that the Curriculum employees were "terrified" to speak about Robinson, and one employee told Watkins that saying anything about Robinson was suicide. (PL Ex. 22, Watkins April 12, 2010, E-mail to Sellers).

37.    Frank Troha, Manager of Development, describes Robinson as an absolutely horrible individual. (PL Ex. 26, Troha Dep., p. 26).

### C.    PLAINTIFF'S DEMOTION AND REDUCTION IN PAY

38.    Robinson demoted Plaintiff to an editor position. (Def Ex. A, Plaintiff Dep., p. 127).

39.    Robinson did not tell Plaintiff she was being demoted and Plaintiff learned of her demotion to editor when she was handed a piece of paper in a meeting, distributed by Robinson and Ramon Nelson, listing the employees and their positions. (DEF Ex. A, Plaintiff Dep., p. 127-128).

40.    In April 2010, Plaintiff's pay was reduced $1500.00, and Robinson failed to tell Plaintiff her pay was being reduced. (DEF Ex. C, Watkins Dep., p. 402-404; & DEF Ex. A, Plaintiff Dep., p. 186).

41.    Plaintiff complained to Watkins about her pay being substantially reduced and Watkins informed Plaintiff her pay was reduced because Plaintiff was demoted and placed on a PIP. (DEF Ex. A, Plaintiff Dep., p. 131-132).

42.    In April 2010, Plaintiff asked Paula Watkins, Human resources Manager, after Robinson had been terminated, who made the decision to demote her and Watkins informed Plaintiff it was Robinson. (DEF Ex. A, Plaintiff Dep., p. 128-129).

D.    **PLAINTIFF AND OTHER PREGNANT EMPLOYEE HARASSED FOR WORKING FLEXTIME AND NOT WORKING SEVENTY TO EIGHTY HOURS A WEEK**

43.    Plaintiff suffered from morning sickness when she was pregnant and would have to report to work late, but Plaintiff worked late to make her time which was allowed under SAIC's flextime policies. (DEF Ex. A, Plaintiff Dep., p. 335-336).

44.    Plaintiff was chastised for working flextime when she was pregnant. (DEF Ex. A, Plaintiff Dep., p. 56-57).

45.    Breanna Farmer, a salaried employee in the Curriculum Department, was pregnant and had to come in late due to morning sickness, but under the flextime practices of SAIC Farmer would stay late to make up her time. (DEF Ex. A, Plaintiff Dep., p. 45, 48-49, 52, 335).

46.     Robinson complained about Farmer reporting to work late and Farmer was informed that she could no longer come in late. (DEF Ex. A, Plaintiff Dep., p. 48-49).

47.     Bob Baker, the Curriculum Department Manager, informed Plaintiff he did not agree with Farmer being called in and disciplined about being tardy when she was having morning sickness. (DEF Ex. A, Plaintiff Dep., p. 55).

48.     Plaintiff and Farmer were also chastised by Robinson, Curriculum Manager, when they were pregnant for only being able o work 40 hours a week. (DEF Ex. A, p. 56).

49.     Every other SAIC employee was allowed to work flextime and use vacation time or comp time to cover tardy or absence, however Plaintiff and Farmer, the two pregnant employees under Robinson's supervision were not allowed this same treatment. (DEF Ex. A, Plaintiff Dep., p. 56-57).

50.     Exempt employees like Plaintiff had ver flexible hours and working flex time was not an issue. (DEF Ex. D, Sample Dep., p. 67).

51.     Around July 2009, Robinson chastised Plaintiff and Farmer in a group meeting of Curriculum Department employees and stated, "I am very impressed by all the people that are working these seventy - and eighty-hour work weeks. But there are two of you that just have worked in the forties. That is not acceptable. We are going to have to get those hours up" (DEF Ex. A, Plaintiff Dep., p. 57-59).

52.     Plaintiff and Farmer were the only two employees who were pregnant. (DEF Ex. A, Plaintiff Dep., p. 314, 328).

53.     Plaintiff had a doctors excuse, dated July 22, 2009, restricting her work hours, but she did not turn in her excuse to Robinson because she feared she would be fired. (DEF Ex. A, Plaintiff's Dep., p. 56, 88-89, 117, 249, 334; & PL Ex. 3, Plaintiff's medical excuse).

54.     On August 5, 2009,  Robinson sent an email about employees working on projects over the weekend and stated in the email, "I understand that Breanna [Farmer] and Mandy [Plaintiff] have baby-related commitments over this weekend." (DEF Ex. A, Plaintiff Dep., p. 110 & PL Ex. 10, Robinson's August 5, 2009 Email).

55.     The whole time Plaintiff was pregnant Robinson treated Plaintiff in a hostile manner and it progressively got worse. (DEF Ex. A, Plaintiff Dep., p. 169-172

56.     Plaintiff had met,  and even worked with, Robinson before Plaintiff was pregnant and Robinson was friendly and treated Plaintiff better than she did when Plaintiff was pregnant. (DEF Ex. A, Plaintiff Dep., p. 173).

C.     DISCRIMINATION OF PREGNANT CO-WORKER, BREANNA FARMER,

57.     In or around  November 2009, Breanna Farmer, a writer in the Curriculum Department, resigned from her employment with SAIC the week she was scheduled to return from maternity leave. (DEF Ex. A, Plaintiff Dep., p. 45).

58.     Farmer was going to be placed on a PIP when she returned from

maternity leave, but Farmer was never given the PIP because she resigned. (DEF Ex. A, Plaintiff Dep., p. 45, 62).

59.     Before Farmer left to go on maternity leave, Bob Baker, Curriculum Manager, had a meeting with Plaintiff and Farmer ,and Baker instructed Farmer that she was not allowed to ask questions in meetings anymore because Robinson believed she [Farmer] had a bad attitude because she asked questions. (DEF Ex. A, Plaintiff Dep., p. 47-48).

60.     Farmer suffered from morning sickness while she was pregnant and had to come in late some mornings. (DEF Ex. A, Plaintiff Dep., p. 335).

61.     Farmer worked flex time and stayed late to make up her time and was able to get her work done. (DEF Ex. A, Plaintiff Dep., p. 335-336).

62.     Farmer followed SAIC's policies regarding flex time. (DEF Ex. A, Plaintiff Dep., p. 336 ).

### E.   PLAINTIFF'S REQUEST FOR FMLA LEAVE

63.     On August 12, 2009, Plaintiff turned in paperwork requesting maternity leave. (DEF Ex. A, Plaintiff Dep., p. 97; & PL Ex. 19 Plaintiff's August 12, 2009 FMLA Request).

64.     Plaintiff talked to Paula Watkins, Human Resources, about her FMLA leave. (DEF Ex. A, Plaintiff Dep., p. 99).

### G.   PLAINTIFF WAS PLACED ON A PIP

65.     On August 13, 2009, one day after submitting her written request for FMLA leave, Plaintiff was presented with and placed on a PIP. (DEF Ex. A, Plaintiff Dep., p. 144, & PL Ex. 5, August 13, 2009 PIP).

66.     The PIP issued to Plaintiff was supposed to include the specific dates any manager talked with or counseled Plaintiff about her performance issues. "It should -- it should include any prior counseling or any, you know, prior issues of performance that had been called to the employee's attention." (DEF Ex. D, Sample Dep., p. 96).

67.     Plaintiff's PIP does not list any dates anyone counseled or disciplined Plaintiff and Sample testified there are no dates listed in the PIP that reference Robinson's alleged meetings with Plaintiff. "I don't see reference to Dr. Robinson's meetings with Amanda Abernathy." (DEF Ex. D, Sample Dep., p. 97).

68.     Sample never had a meeting with Plaintiff to discuss any issues.

Q.     Did you take Amanda Abernathy aside separate from that meeting with everybody and say, Amanda, sit down, I want to show you what you did wrong in this and I'm going to give you a counseling?

A.     No.

Q.     And Dr. Robinson -- there's nothing to indicate in Plaintiff's Exhibit 10 any date where Dr. Robinson sat down with Amanda Abernathy to discuss any performance issues, is there?

A.     There doesn't appear to be one here. (DEF Ex. A, Sample Dep.,

p. 98).

69.     Robinson, Sample and Watkins were present when Plaintiff was given a copy of the PIP. (DEF Ex. A, Plaintiff Dep., p. 229; & DEF Ex. C, Watkins Dep., p. 141).

70.     Sample, Project Manager, informed Plaintiff in the meeting her work must be perfect with zero errors. (DEF Ex. A, Plaintiff Dep., p. 229).

71.     However, while Plaintiff was on maternity leave, other writers and editors signed a document informing them that they had to have less that three percent (3%) in errors. (DEF Ex. A, Plaintiff Dep., p. 229).

72.     Plaintiff was eight and a half months  pregnant when she was placed on a PIP. (Plaintiff Dep., 170-171).

73.     Sample testified there were a total of six editors and writers and they all had issues, but he did not issue PIP's to all six of the. (Def Ex. D, Sample Dep., p. 127).

74.     Sample was ugly and irate with Plaintiff when Plaintiff was presented with the PIP. (DEF Ex. A, Plaintiff's Dep., p. 259-260).

75.     Sample told Plaintiff she better have zero errors and that her work better be perfect. (DEF Ex. A, Plaintiff Dep., p. 259).

76.     No one discussed any alleged issues with Plaintiff's performance prior to Plaintiff being placed on a PIP on August 13, 2009. (DEF Ex. A, Plaintiff Dep., p. 150).

77.   Robinson never discussed any alleged issues with Plaintiff's performance with Jim Sample, Project Manager. (DEF Ex. D, Sample Dep., p. 163-164)

78.   Sample did not draft the PIP that was issued to Plaintiff, and he did not collect information regarding the allegations raised in the PIP; all he did was review the PIP and sign it. (DEF Ex. D, Sample Dep., p. 164).

79.   Sample testified the PIP was created entirely by Watkins. (DEF Ex. D, Sample Dep., p. 164).

80.   Prior to Plaintiff being presented the PIP, no one had any discussions with Sample about placing Plaintiff on a PIP. (DEF Ex. D, Sample Dep., p. 78).

81.   Plaintiff never received any criticism from Jim Sample, Project Manager, about her performance on 61 courses, which was the area of curriculum Plaintiff was assigned to. (DEF Ex. A, Plaintiff Dep., p. 151).

82.   In addition, Sample never provided Plaintiff with steps to improve her performance. (DEF Ex. A, Plaintiff Dep., p. 160).

83.   Plaintiff never met with Robinson prior to receiving the August 13, 2009 PIP, and Plaintiff testified, "She never once met with me." (DEF Ex. A, Plaintiff Dep., p. 153).

84.   However, Robinson falsely indicated in the PIP, "In addition to the above meetings, Caroline Robinson, Ph.D., acting Curriculum Manager, has been

meeting with you [Plaintiff] over the past two weeks to emphasize these same points." (PL Ex.5, Plaintiff's PIP; & DEF Ex. A, Plaintiff Dep., p. 153).

85.   The PIP also indicated Plaintiff had editing issues with the HOT8, CSM, and HOT materials; however, Plaintiff did not have any editing responsibility for this material and only worked on the matrix. (DEF Ex. A, Plaintiff Dep., p. 155-156).

86.   In addition, the PIP issued to Plaintiff indicated Plaintiff had editing responsibility for the HEC and TERT materials, but Plaintiff did not work on these materials. (DEF Ex. A, Plaintiff Dep., p. 155).

87.   Plaintiff was not performing editing duties at the time she received the PIP, as this was not what she was assigned to do. (DEF Ex. A, Plaintiff Dep., p. 156).

88.   Plaintiff did not fail to edit any courses because she was not asked or assigned to edit courses. (DEF Ex. A, Plaintiff Dep., p. 156-157).

89.   The person who edited HOT8, CSM, HOT, HEC and TERT should have been placed on a PIP if there we as many issues with these materials as alleged in Plaintiff's PIP. (DEF Ex. A, Plaintiff Dep., p. 158).

90.   Plaintiff sent an email to Paula Watkins, Human Resources, complaining that the PIP was unfair and that she signed it under duress because she was nine months pregnant and afraid of losing her job. (PL Ex. 9,Plaintiff's November 13, 2009 e-mail and e-mail chain between Plaintiff and Watkins; & DEF Ex. A, Plaintiff Dep., p. 258-259).

91.     Plaintiff also complained to Dickerson that she was under duress to sign the PIP because she was pregnant, needed her job and if she did not sign the PIP she felt she would have been terminated. (DEF Ex. G, Dickerson Dep., p. 55-56).

92.     Watkins never met with Plaintiff to discuss what Plaintiff contended was included in the PIP that was based on false information (DEF Ex. C, Watkins dep., p. 313-314).

93.     Watkins never asked Sample to meet with Plaintiff to discuss the PIP. (DEF Ex. C, Watkins Dep., p. 316).

94.     Plaintiff sent an email requesting to meet with Robinson and Watkins about the PIP. (DEF Ex. A, Plaintiff Dep., p. 104).

95.     On December 1, 2009, Plaintiff also told Watkins she wanted to meet with Robinson and Sample to address her concerns with the PIP. (PL Ex. 20, December 1, 2009, e-mail from Watkins to Robinson).

96.     Neither Watkins nor Robinson ever informed Sample that Plaintiff was requesting to speak with him to complain about the PIP, and Sample testified they should have informed him of Plaintiff's complaints. (DEF Ex. D, Sample Dep., p. 165).

97.     Plaintiff brought documents to the meeting to prove the PIP was unfounded and had the pages highlighted to show she was not the final read on documents at issue and that none of the reasons stated for placing plaintiff on a PIP

were valid. (DEF Ex. A, Plaintiff Dep., p. 61, 104).

98.    Plaintiff set a meeting with Robinson, Curriculum Manager, and Watkins, Human Resources,  in December when she returned from maternity leave, to rebut the PIP and complained to Watkins stating, "I find it ironic that I am the only one here that was pregnant, and the day after I turned in my FMLA papers, I get put on a PIPP."(DEF Ex. A, Plaintiff Dep., p. 62-63, 83-84).

99.    Paula Watkins, Human Resources Manager, then informed Plaintiff that Farmer was also supposed to be placed on a PIP, but was not because she resigned from her position and did not return from maternity leave. (DEF Ex. A, Plaintiff Dep., p. 62, 86-87).

100.   One of the issues in the PIP issued to Plaintiff alleged Plaintiff was the final read on several documents, and in the December meeting with Robinson and Watkins, Plaintiff had documents to refute this allegation and prove she was not the final read on the documents at issue. (DEF Ex. A, Plaintiff Dep., p. 84, & PL Ex. 5, Plaintiff's PIP).

101.   When Plaintiff presented the documents to Robinson and Watkins she was told that it did not matter. (DEF Ex. A, Plaintiff Dep., p. 84).

102.   Plaintiff asked Robinson and Watkins for documentation to prove the allegations in the PIP and Robinson stated she forgot to bring the documents to the meeting. (DEF Ex. A, Plaintiff Dep., p. 84, 264, 230).

103.   Plaintiff complained about the PIP in the meeting stating, "None of this happened until I got pregnant and turned in my leave, FMLA leave, and the next day I am on a PIPP" and Robinson laughed off Plaintiff's pregnancy discrimination complaints and told Plaintiff she "was being ridiculous." (DEF Ex. A, Plaintiff Dep., p. 84).

104.   Plaintiff then asked Robinson and Watkins to explain why she was being placed on a PIPP, because she had never been informed as to why she was receiving this discipline and Robinson gave no specifics stating only, "Well, one of the documents you had, there was a mistake in it." (DEF Ex. A, Plaintiff Dep., p. 84).

105.   Plaintiff asked Robinson what kind of mistake, and Robinson responded that she did not know and did not have the document. (DEF Ex. A, Plaintiff Dep., p. 84-85).

106.   Plaintiff asked additional questions about the alleged mistake and asked Robinson what book she was referring to and Robinson indicated the book, which was a book that was split between Plaintiff and another employee, Babette Harman. (DEF Ex. A, Plaintiff Dep., p. 85).

107.   Plaintiff showed Robinson and Watkins the documents to prove she was not the final read and they ignored the documents. (DEF Ex. A, Plaintiff Dep., p. 86).

108.   Plaintiff even gave Watkins and Robinson an email where Robinson stated she had assigned another employee to be the final read and Robinson and

Watkins refused to even look at the email. (DEF Ex. A, Plaintiff Dep., p. 86).

109.   Watkins then informed Plaintiff, "Well if you want the documentation, we'll get you the documentation" and Plaintiff again informed Watkins and Robinson that she wanted to see the documentation proving the issues asserted in the PIP. (DEF Ex. A, Plaintiff Dep., p. 86).

110.   Plaintiff was never provided this documentation. (DEF Ex. A, Plaintiff Dep., p. 86).

111.   Plaintiff tried to raise arguments as to why she should not be placed on a PIP but Sample, Robinson and Watkins would not listen, cutting Plaintiff off, and Plaintiff was upset and afraid she was going to be fired so she signed the PIP. (DEF Ex. A, Plaintiff Dep., p. 259-260).

112.   Plaintiff also stated to Robinson that she had done everything Robinson had asked her to do and had worked hard and that she did not understand why she was being issued a PIP. (DEF Ex. A, Plaintiff Dep., p. Add

113.   When a PIP was issued to an employee the employee was supposed to be informed of their shortcoming or performance issues, however Plaintiff was never informed of the specific issues or shortcomings with her performance. (DEF Ex. A, Plaintiff Dep., p. 89).

114.   In addition, the manager was supposed to meet with an employee who was on a PIP once a week to discuss the issues. (DEF Ex. A, Plaintiff Dep., p. 89-90).

115.   Plaintiff only had one meeting with Robinson and all Robinson did was inform Plaintiff that Marcia Dickerson, ISD, was going to be Plaintiff's direct supervisor and she would meet with Plaintiff about the PIP. (DEF Ex. A, Plaintiff Dep., p. 90).

116.   Plaintiff never met with Dickerson regarding counseling related to her PIP, but Dickerson did meet with Plaintiff to let her know she was aware of the PIP and Plaintiff was starting with a clean slate. (DEF Ex. A, Plaintiff Dep., p. 90; & DEF Ex. G, Dickerson Dep., p. 46).

117.   Plaintiff contends she was placed on a PIP because Robinson and Jim Sample, Project Manager, were upset she was going on maternity leave and she turned in papers for FMLA maternity leave. (DEF Ex. A, Plaintiff Dep., p. 93).

118.   Dickerson was present in a meeting when Plaintiff requested to see the documents that proved she committed the errors and other issues set forth in the PIP. (DEF Ex. G, Dickerson Dep., p. 51).

119.   Dickerson asked Watkins for the same documents related to Plaintiff's PIP, and Dickerson was told to mind her own business.  (DEF Ex. G, Dickerson Dep., p. 51, 82).

120.   Dickerson also asked Robinson and Watkins to see a copy of Plaintiff's PIP, but was never shown a copy.  (DEF Ex. G, Dickerson Dep., p. 51-52).

121.   Dickerson told Watkins that Plaintiff complained she had been placed

on a PIP because she was pregnant. (DEF Ex. G, Dickerson Dep., p. 58).

122.   Dickerson told BJ Jennings about these issues regarding Plaintiff's PIP. (DEF Ex. G, Dickerson Dep., p. 51-52).

123.   Plaintiff was never informed about her performance after being placed on the PIP. (DEF Ex. A, Plaintiff Dep., p. 163-164).

124.   Dickerson was informed Plaintiff was placed on a PIP while Plaintiff was out on maternity leave. (Def Ex, G, Dickerson Dep., p. 51,

125.   Plaintiff worked through her PIP and was to be taken off the PIP, however, Robinson would not tell Plaintiff or let Dickerson inform Plaintiff she was off the PIP, after being instructed to do so. (DEF Ex. A, Plaintiff Dep., p. 164, 230-231; & DEF Ex. C, Watkins Dep., p. 529-530).

126.   On March 11, 2010, Dickerson told Plaintiff she had asked Robinson at least four times if she could tell Plaintiff she was off the PIP, and Robinson told Dickerson no every time. (Def Ex. A, Plaintiff Dep., p. 230-231).

127.   Dickerson finally told Plaintiff she was off the PIP, but Dickerson told Plaintiff she could not say anything to anyone. (DEF Ex. A, Plaintiff Dep., p. 164).

128.   Robinson would not let Plaintiff know she had worked through her PIP, even after Sample and Watkins instructed her to do so. (DEF Ex, A, Plaintiff Dep., p. 166; PL Ex.14, Watkins May 30, 2010 e-mail to Kelly; DEF Ex. C, Watkins Dep., p. 400-401).

129.   Watkins, Human Resources Manager, testified it could be discriminatory to fail to inform an employee that they had worked through their PIP, and Watkins sees how Plaintiff could believe Robinson's conduct was discriminatory. (DEF Ex. C, Watkins Dep., p. 402).

130.   Plaintiff worked through her PIP with good performance in thirty (30) days. (DEF Ex. C, Watkins Dep., p. 307).

H.   **ROBINSON AND SAMPLE WERE HOSTILE TO PLAINTIFF**

131.   Plaintiff knew Robinson was upset about her maternity leave because of the way Robinson treated Plaintiff the entire time she was pregnant. (DEF Ex. A, Plaintiff Dep., p. 93).

132.   The day Plaintiff returned form maternity leave he came to Plaintiff at 8:00 am that morning and told Plaintiff that Robinson informed him that attitudes had improved one hundred percent since Farmer and Plaintiff left on maternity leave. (DEF Ex. A, Plaintiff Dep., p. 94)

133.   Sample and Robinson were upset with Plaintiff being pregnant because she was unable to physically work the seventy and eighty hour work weeks Robinson expected the employees to work or spend the night at the office working all night which Robinson also expected. (DEF Ex. A, Plaintiff Dep., p. 95).

134.   Robinson raised her voice at Plaintiff numerous times, especially after Plaintiff returned form maternity leave. (DEF Ex. A, Plaintiff Dep., p. 217-218).

135.   Robinson, Plaintiff and Lynn Rice were in a meeting and Robinson was in the process of interviewing applicants for positions in the Curriculum Department so Rice asked Robinson what type of questions she could ask to make sure a good capable person was hired and Robinson responded, looking directly at Plaintiff, "What, like if they have a baby?" (Def Ex. A, Plaintiff Dep., p. 95-96).

136.   Robinson was hostile to Plaintiff. (DEF Ex. A, Plaintiff Dep., p. 165).

137.   Robinson raised her voice at Plaintiff and if Plaintiff was talking with another employee about work related matters Robinson would ask Plaintiff in a terse and disrespectful tone what she was working on and where she needed to be, but Robinson would not do the same to other employees. (DEF Ex. A, Plaintiff Dep., p. 218).

138.   Robinson would not speak to Plaintiff when Plaintiff spoke to her (Def Ex. A, Plaintiff Dep., p. 165).

139.   Robinson unjustly accused Plaintiff of rolling her eyes, lying, having poor performance when she did not, and having a horrible attitude. (DEF Ex. A, Plaintiff Dep., p. 165).

140.   Dickerson testified Plaintiff was always professional. (DEF Ex. G, Dickerson Dep., p. 37).

141.   Robinson would stick her head in Plaintiff's office every day to see if Plaintiff was there and what she was doing without ever speaking to Plaintiff. (DEF

Ex. A, Plaintiff Dep., p. 166).

142.   Robinson tried to turn Plaintiff's supervisor against Plaintiff, Marcia Dickerson, before Plaintiff returned from maternity leave. (DEF Ex. A, Plaintiff Dep., p. 166).

143.   Robinson demoted Plaintiff from Senior Editor to Editor. (DEF Ex. A, Plaintiff Dep., p. 166).

144.   Robinson kept Plaintiff from timely receiving a pay increase. (DEF Ex. A, Plaintiff Dep., p. 166).

145.   Robinson would not let Plaintiff work on or edit some materials, and then later falsely accused Plaintiff of performance issue with the very books she would not let Plaintiff work on. (DEF Ex. A, Plaintiff Dep., p. 166).

146.   Robinson assigned Plaintiff a one percent error rate when every other employee had a three percent error rate. (DEF Ex. A, Plaintiff Dep., p. 166-167).

147.   Robinson complained about Plaintiff coming late when she was pregnant but let other employees come in late and work late to make up the time. (DEF Ex. A, Plaintiff Dep., p. 168).

148.   Robinson destroyed Plaintiff work reputation at SAIC, that Plaintiff had spent six years building. (DEF Ex. A, Plaintiff Dep., p. 168).

149.   Robinson would use Plaintiff and Framer, the only two pregnant employees, as the "scape goats" if something went wrong and blame them. (DEF Ex.

A, Plaintiff Dep., p. 170).

150.    While Plaintiff was out on maternity leave, Robinson talked to Plaintiff's new supervisor, Marcia Dickerson, about Plaintiff and everything Robinson told Dickerson about Plaintiff was negative. (Def Ex. G, Dickerson Dep., p. 41).

151.    Robinson told Dickerson, while Plaintiff was out on maternity leave, that Plaintiff was a problem, a trouble maker, did not work, and did not do good work. (DEF Ex. G, Dickerson Dep., p. 41-42).

152.    Dickerson found Robinson's comments about Plaintiff to be untrue and it is Dickerson's opinion, as Plaintiff's immediate supervisor, that Plaintiff was a good employee. (DEF Ex. G, Dickerson Dep., 42-43).

153.    Robinson even informed Dickerson that Plaintiff had raised some issues about being treated differently because of her pregnancy. (DEF Ex. G, Dickerson Dep., p. 43-44).

### I.    ROBINSON MOVED PLAINTIFF'S OFFICE TO A STORAGE CLOSET

154.    Robinson took away Plaintiff's office and made the decision to move Plaintiff's office to a storage closet. (DEF Ex. A, Plaintiff Dep., p. 166; Pl Ex. 14, Watkins' May 30, 2010 E-mail; & DEF Ex. C, Watkins Dep., p. 513).

155.    While Plaintiff was out on maternity leave, Robinson offered Plaintiff's office to the government to be used as a library, even though there were numerous empty rooms on the same hallway that could have been used for the library. (DEF Ex.

A, Plaintiff Dep., p. 257; & DEF Ex. C, Watkins Dep., p. 516).

156.   Watkins was involved in investigating Robinson's decision to move Plaintiff's office to a storage closet because this was after SAIC received Plaintiff's EEOC charge and Watkins testified she was trying to prevent retaliation. (DEF Ex. C, Watkins Depo., p. 517-518).

157.   Watkins asked an employee to take a picture of the storage closet, but Defendant has failed to produce a copy of this photograph. (DEF Ex. C, Watkins Dep., p. 510).

158.   Watkins determined that "Moving any current staffer into what is viewed as a storage closet is perceived as less than respectful. (DEF Ex. C, Watkins Dep., p. 514; Pl Ex. 15, Watkins May 28, 2010 e-mail to Kelly).

159.   Watkins also determined that Robinson's decision to move Plaintiff's office to a storage closet could be retaliation. "However, a move to a storage closet could be construed as retaliatory if someone wanted to do so. Mandy knows that the decision was made by Caroline." (DEF Ex. C, Watkins Dep., p. 518; Pl Ex. 14 Watkins May 30, 2010 e-mail to Kelly).

### J.   ROBINSON CHANGED PLAINTIFF'S APRIL 2010 REVIEW SCORES

160.   Dickerson, Plaintiff's immediate supervisor, was assigned to evaluate four employees, Plaintiff and Lynn Rice were two of the employees. (DEF Ex. G, Dickerson Dep., p. 62-63).

161.   After Dickerson filled out the evaluations she gave them to Robinson. (DEF Ex. G, Dickerson Dep., p. 63).

162.   Dickerson felt Plaintiff's evacuation was a true reflection of her performance since the time Plaintiff had returned to work from maternity leave. (DEF Ex. G, Dickerson Dep., p. 64).

163.   Five was the highest score and employee could receive and one was the lowest. (DEF Ex. G, Dickerson Dep., p. 65).

164.   Dickerson did not rate Plaintiff a score of 2 in any category. (DEF Ex. G, Dickerson dep., p. 65).

165.   Dickerson rated Plaintiff mostly fours and some 3's in each category. (DEF Ex. G, Dickerson Dep., p. 65).

166.   Robinson told Dickerson she could not evaluate employees above a certain number, which was a 3. (DEF Ex. G, Dickerson Dep., p. 65).

167.   Dickerson told Robinson she did not agree with what Robinson was asking her to do, which was to provide lower ratings. (DEF Ex. G, Dickerson Dep., p. 66).

168.   Robinson gave Dickerson the evaluations back and instructed her to lower the scores, so Dickerson rated Plaintiff all 3's, but felt she deserved higher ratings. (DEF Ex. G, Dickerson dep., 67).

169.   Dickerson met with Plaintiff and went over the evaluation she filled out

for Plaintiff after Robinson instructed Dickerson to lower the scores. (DEF Ex. G, Dickerson Dep., p. 68-69).

170.   Plaintiff was upset with her evaluation scores and Dickerson was honest with Plaintiff and let Plaintiff know she had been instructed not to give a rating above a 3. (DEF Ex. G, Dickerson dep., p. 70-71).

171.   Dickerson later learned from Plaintiff that Robinson had changed Plaintiff's evaluation scores to even lower scores giving Plaintiff a 2 in some categories. (DEF Ex. G, Dickerson Dep., p. 68-70).

172.   Robinson did not discuss the change in Plaintiff's evaluation scores with Dickerson. (DEF Ex. G, Dickerson Dep., p. 71).

173.   Dickerson recalls that Robinson changed only the evaluations scores Dickerson had given Plaintiff and Lynn Rice. (DEF Ex. G, Dickerson Dep., p. 69-70).

174.   Dickerson complained to Paula Watkins, Human Resources Manager, about Robinson asking her to give lower evacuation scores. (DEF Ex. G, Dickerson Dep., p. 66, 71-72).

175.   Dickerson was not aware of Watkins conducting any investigation into her complaints. (DEF Ex.G, Dickerson Dep., p. 73).

176.   Sample testified that you were supposed to evaluate your direct reports and then all your manager would do is check over the evaluation, as the evaluator the appropriate questions and sign off on the evaluation. (PL Ex. 4, Sample Dep.,

*Cummins v. SAIC*, p. 164).

176.   The only contribution Robinson was supposed to have with regard to Plaintiff's evaluation was if she did not agree with the evaluation to talk it over with the evaluating manager. (PL Ex. 4, Sample Dep., *Cummins v. SAIC*, p. 166-167).

177.   Sample further testified that for Robinson to change the evaluation scores on Plaintiff's evaluation without consulting Dickerson was inappropriate. (PL Ex. 4, Sample Dep., *Cummins v. SAIC*, p. 166-167).

178.   Plaintiff first received an evaluation with a lower score because Robinson had changed the evaluation score to a "2" from the higher score that had been given to Plaintiff by Marcia Dickerson, Plaintiff's immediate supervisor. (DEF Ex. A, Plaintiff's Dep., p. 268).

179.   After Robinson and Sample were terminated, Plaintiff's evacuation was changed back to the original scores given by her immediate supervisor, Marcia Dickerson. (DEF Ex. A, Plaintiff Dep., p. 132; & DEF Ex. C, Watkins Dep., p. 300).

180.   Plaintiff was denied a pay raise because Robinson changed and lowered Plaintiff's evaluation scores. (DEF Ex. A, Plaintiff Dep., p. 134).

181.   Marcia Dickerson, Plaintiff's immediate supervisor and the person who completed Plaintiff's performance evaluation, was upset Robinson changed Plaintiff's evaluation scores so Dickerson complained. (DEF Ex. A, Plaintiff Dep., p. 134).

182.   Dickinson filed an ethics complaint and her complaints were

investigated. (DEF Ex. 12, Dickerson's Ethics Complaint).

183.   Plaintiff's evaluation scores were changed back to the evaluation scores Dickinson gave Plaintiff and Jennings, testified that SAIC's decision to change Plaintiff's scores back to the higher scores gave validity to Dickerson's complaints about Robinson. (DEF Ex. I, Jennings Dep., p. 191).

184.   Robinson changed Plaintiff's evaluation to indicate Plaintiff made errors, not performed at her best,  had been placed on a PIP and had performed less than satisfactory work in the past year. (DEF Ex. A, Plaintiff Dep., p. 135).

185.   However, Robinson was aware Plaintiff's work was satisfactory and never showed Plaintiff any mistakes she made. (DEF Ex. A, Plaintiff Dep., p. 136).

### K.   PLAINTIFF DENIED BONUS

186.   Robinson caused Plaintiff to lose a $600.00 bonus in November 2009 because Plaintiff had been placed on a PIP. (DEF Ex. A, Plaintiff Dep., p. 166, 258).

187.   Watkins informed Plaintiff she did not receive her award fee bonus because she was "placed on a PIP and it is on file." (PL Ex. 9, Watkins' November 13, 2009 e-mail chain between Plaintiff and Plaintiff).

188.   There was no written policy at SAIC stating an employee could not receive the bonus if they were on a PIP. (DEF Ex. C, Watkins Dep., p. 525-526).

189.   Watkins does not know if Plaintiff was ever informed of this policy. (DEF Ex. C, Watkins Dep., p. 528).

190.    In fact Watkins testified that it was not a policy "just information." (DEF Ex. C, Watkins Dep., p. 528).

191.    Sample testified that based on the performance evaluation Plaintiff received for the time period the bonus was to cover, Plaintiff should have received the bonus. (DEF Ex. D, Sample dep., p. 117).

192.    Sample further testified that once Plaintiff successfully completed her PIP she should have received her bonus. (DEF Ex. D, Sample Dep., p. 117).

## L.    COMPLAINTS ABOUT ROBINSON

193.    Plaintiff even sent Watkins an e-mail on November 13, 2009, complaining to Watkins that she was forced to sign the Pip under duress because she was nine months pregnant and that the PIP was based on false information. (PL Ex. 9, Plaintiff's November 13, 2009 e-mail to Watkins).

194.    BJ Jennings, Publications Manager, and Eddie Hulsey, Program Manager, came to the Anniston facility and Plaintiff understood they were conducting an investigation regarding Jim Sample and Robinson. (DEF Ex. A, Plaintiff Dep., p. 133).

195.    Jennings came ton the Anniston facility twice, once in August 2009 and again in April 2010, to review the Curriculum Department. (DEF Ex. A, Plaintiff Dep., p. 230).

196.    During Jennings' August 2009 visit, which was right before Plaintiff

went out on maternity leave, Plaintiff had a conversation with Jennings on August 14,

2009, who was visiting the Curriculum Department to investigate complaints about

Sample and Robinson, and Plaintiff complained to Jennings that she turned in her

FMLA papers on August 12, 2009 and the next day, August 13, 2009, she was given

a PIP.  (DEF Ex. A, Plaintiff's Dep., p. 230, 284-285, 291-292).

197.  Plaintiff told Jennings that she had been treated horribly since she

became pregnant. Plaintiff also complained to Jennings that she had been told that she

had to have perfect work.  (DEF Ex. A, Plaintiff's Dep., p. 230, 284-285, 291-292).

198.   Jennings asked Plaintiff if anyone else was on a PIP and Plaintiff

informed Jennings that she was the only one. Jennings told Plaintiff that was not fair

and that she could not be held to a higher standard. (DEF Ex. A. Plaintiff's Dep., p.

230, 284-285, 291-292).

199.   Plaintiff also complained that Breanna Farmer, pregnant co-worker, was

treated differently because she was pregnant, but nothing was done to investigate this

complaint. (DEF Ex. C, Watkins Dep., p. 539).

200.   One of the reasons Robinson was investigated was because she changed

the scores on Plaintiff's performance evaluation given to Plaintiff by her immediate

supervisor, from good scores to low scores (DEF Ex. A, Plaintiff Dep., p. 133-134).

201.   Beginning in February 2010, Sample testified things had gotten steadily

worse with Robinson and he and Watkins became aware of issues regarding Robinson

that gave them concern as to whether or not Robinson could continue in her position as Curriculum Manager. (DEF Ex. D, Sample Dep., p. 43).

202.   Sample and Watkins became aware of complaints about Robinson that were founded. (DEF Ex. D, Sample Dep., p. 43; & PL Ex. 17, Watkins May 4, 2010 E-mail).

203.   Marcia Dickerson, ISD and Plaintiff's immediate supervisor, complained to Defendant's ethics department about Robinson and complained that she feared Robinson would retaliate against her which caused her to seek other employment. (DEF Ex. I, Jennings Dep., p. 91-92; PL Ex. 27, Storm Depo., p. 241; & PL Ex. 12, Dickerson's Ethics Complaint, bates # 3270).

204.   Dickerson had suffered Robinson's retaliation and witnessed Robinson retaliating against other employees, including Plaintiff and Lynn Rice. (DEF Ex. G, Dickerson Dep., p. 79-80).

205.   Assistant Project Manager, Jessica Cummins, complained about Robinson and was terminated. (PL Ex. 24, Cummins EEOC Charge).

206.   Dickerson told Watkins that Plaintiff complained to her that Robinson was discriminating against her because she was pregnant and took maternity leave. (DEF Ex. G, Dickerson Dep., p. 57-58).

207.   Dickerson also complained about Robinson and Watkins to SAIC's ethics hotline. (PL Ex. 12, Dickerson's Ethics Complaint).

208.   Dickerson complained about Watkins because Watkins was not acting on the complaints and information she was being given about Robinson. (DEF Ex. G, Dickerson Dep., p. 83-84).

209.   Dickerson also heard employees complaining that Watkins would not keep information confidential, and reported these complaints to Jennings. (DEF Ex. G, Dickerson Dep., p. 84-85).

210.   Ann Mitchell, complained to Watkins that when Robinson was employed by SAIC Plaintiff had a target on her back. (PL Ex. 14, Watkins May 30, 2010 e-mail to Kelly; & DEF Ex. C, Watkins Dep., p. 518-519).

211.   Robinson was discouraging employees from complaining to Watkins, Human Resources Manager. (DEF Ex. C, Watkins Dep., p. 384).

212.   Lynn Rice, Editor, informed Dickerson, Plaintiff's immediate supervisor, Plaintiff complained she was being treated unfairly because of her pregnancy. (DEF Ex. G, Dickerson Dep., p. 45).

213.   Dickerson informed BJ Jennings, Publications Manager, who was investigating Dickerson's ethics complaint against Watkins and Robinson and who had been to the Anniston facility to investigate Robinson, that both the Plaintiff and Lynn Rice had complained to her about Plaintiff being treated differently because of her pregnancy and Plaintiff being retaliated against. (DEF Ex. G, Dickerson Dep., p. 80-81).

214.   BJ Jennings visited the Anniston location to conduct an assessment and personally witnessed serious concerns with Watkins performance as the human Resources Manager. (DEF Ex. I, Jennings Dep., p. 192).

J.   **SAIC'S INVESTIGATION OF PLAINTIFF'S EEOC CHARGE**

215.   Plaintiff filed a Charge of Discrimination with the EEOC on December 29, 2009. (PL Ex. 25, Plaintiff's EEOC Charge).

216.   Watkins participated in the investigation of Plaintiff's EEOC Charge and testified that SAIC did not talk to or interview any witnesses regarding Plaintiff's charge and the investigation just involved gathering documents. (DEF Ex. C, Watkins Dep., p. 530).

217.   Watkins was allowed to determine what documents were relevant and needed to be produced to the EEOC. (DEF Ex. C, Watkins Dep., p. 530).

218.   SAIC allowed Watkins input and control over the investigation of the claims set forth in Plaintiff's EEOC charge knowing Watkins was named in Plaintiff's EEOC charge as someone Plaintiff was complaining about. (DEF Ex. C, Watkins Dep., p. 530-531).

219.   Watkins' emails and documentation regarding Robinson"s retaliation against Plaintiff for making the decision to move Plaintiff's office to a storage closet were never provided to the EEOC. (Def Ex. C, Watkins Dep., 532; Pl Ex.28, SAIC's EEOC Position Statement).

220.    Watkins has never investigated whether or not anyone at SAIC treated Plaintiff differently because of her pregnancy, and testified she "supposes" Plaintiff could have been treated differently because of her pregnancy. (Def Ex. C, Watkins Dep., p. 565).

### K.    ROBINSON AND SAMPLE TERMINATED

221.    Sample and Robinson were terminated on the same day, April 15, 2010. (DEF Ex. D, Sample Dep., p. 35; DEF Ex. H, Robinson Dep., p. 11).

## III   ARGUMENT

### A.    PLAINTIFF WAS DISCRIMINATED AGAINST BECAUSE OF HER PREGNANCY

Title VII of the Civil Rights Act of 1964 provides that "it shall be an unlawful employment practice for an employer (1) to fail or refuse to hire or to discharge or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C.2000e-2(a)(1) (2007). In 1978, Congress amended Title VII of the Civil Rights Act of 1964 to include the Pregnancy Discrimination Act (PDA), which expands the Act's definition section to encompass pregnancy-based discrimination under the definition of sex discrimination:

The terms "because of sex" or "on the basis of sex" include, but are not

limited to, because or on the basis of pregnancy, childbirth, or related

Page 76 of 85

medical conditions; and women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment related purposes....42 U.S.C. § 2000e(k) (2007).

The analysis required to prove a pregnancy discrimination claim mirrors that of Title VII sex discrimination claims. Maddox v. Grandview Care Center, Inc.,780 F.2d 987, 989 (11th Cir.1986).

"The importance of McDonnell Douglas lies, not in its specification of the discrete elements of proof there required, but in its recognition of the general principle that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on [an illegal] discriminatory criterion...." *International Broth, of Teamsters v. United States*,431 U.S. 324, 358, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). Plaintiff therefore carries her prima facie burden if she has provided sufficient evidence to permit a reasonable trier of fact to infer that the adverse actions she suffered were based on discriminatory intent.

Defendant argues Plaintiff has not presented any comparators, however, Plaintiff is not required to provide a comparator to establish a *prima facie* case of pregnancy discrimination. The Eleventh Circuit recognized in *Chapter 7 Trustee v. Gate Gourmet, Inc.,* 683 F. 3d 1249 (11th Cir. June 11, 2012),citing *Smith v. Lockheed-Martin*, 644 F.3d 1321, 1328 (11th Cir. 2011). The *McDonnell Douglas*

framework is not the only way to use circumstantial evidence.

Plaintiff contends she has presented comparator evidence regarding the PIP. Specifically, a PIP was drafted for Lynn Rice, who was not pregnant, but the PIP was never issued to Rice and was withdrawn. Sample testified Rice's PIP was retracted because there was no documentation of any prior disciplinary action or counseling. Like Rice, there is no documentation of Plaintiff ever being counseled or disciplined prior to being placed on a PIP on August 14, 2009. The PIP issued to Plaintiff does not make any reference to any prior discipline or counseling for Plaintiff. Watkins' email to Sample, DEF Ex. B,1, clearly states that a PIP will not be issued unless the employee has been counseled and there is documentation of the counseling. Plaintiff was treated less favorably than Rice, who is a direct comparator to Plaintiff.

Plaintiff has also presented evidence that she and Farmer, the only other pregnant employee, were harassed for not working seventy to eighty hours a week. They were also harassed for working flex time when they suffered from morning sickness and informed they could no longer come in late. Sample testified flex time was the standard practice and that salaried employees like Plaintiff and Farmer did not have set hours. Every other employee was allowed to come in late and use flex time to work late without being harassed or told that flex time was no longer available to them.

While Plaintiff believe she has presented ample comparator evidence to defeat

summary judgement, such evidence is not required. Plaintiff has presented other evidence from which a jury could infer that Robinson, Sample and Watkins, discriminated against her because of her pregnancy, including telling Plaintiff she could no longer work flex time, harassing Plaintiff for not working seventy to eighty hours a week, Plaintiff was demoted, presenting Plaintiff with a PIP the day after she requests maternity leave, presenting Plaintiff with a PIP when Plaintiff had not been disciplined prior to receiving the PIP, the negative comment made by Robinson about asking applicants if they had a baby, deciding to move Plaintiff's office to a storage closet while Plaintiff was on maternity leave, refusing to investigate Plaintiff's complaint that she signed the PIP under duress because she was nine months pregnant, failing to inform Plaintiff she was no longer on a PIP, failing to tell Plaintiff her salary had been reduced, and preparing a PIP for the only other pregnant employee, Farmer.

The amount of evidence in this case proving Plaintiff was discriminated against because she was pregnant is staggering. Further, Watkins, Human resources, admitted SAIC did nothing to investigate complaints that Plaintiff and Farmer were being treated differently because they were pregnant.

Given the totality of these circumstances, Plaintiff has provided that "additional factor" of sufficient evidence adequate to permit an inference of discriminatory intent by the reasonable factfinder. Therefore, in accordance with Eleventh Circuit law,

even if the Court determines Plaintiff has not presented a sufficient comparator, Plaintiff has carried her prima facie burden with respect to unlawful pregnancy discrimination and summary judgment is due to be denied.

### B.   PLAINTIFF WAS RETALIATED AGAINST IN VIOLATION OF TITLE VII

A plaintiff can establish a *prima facie* case of retaliation by showing the following elements: (1) she participated in a protected activity; (2) she suffered a materially adverse employment action; and, (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *Burlington N.E. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L.Ed.2d.  Defendant concedes Plaintiff has established the first and second prong of the *prima facie* case. The only issue in the instant case is whether a causal connection existed.

Courts are to construe "the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the ... [adverse] action are not completely unrelated." *Higdon v. Jackson,* 393 F.3d 1211, 1220 (11th Cir.2004). In *Goldsmith v. Bagby Elevator Company. Inc.,* 513 F.3d 1261 (2008), the Eleventh Circuit explained that the causal element for a claim of retaliation can be proven by circumstantial evidence:

> We do not construe the 'causal link' in the [retaliatory discharge] formula to be the sort of logical  connection that would justify a prescription that the protected participation in fact prompted the adverse

action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant. Rather, we construe the causal link element to require merely that the plaintiff establish that the protected activity and the adverse action were not wholly unrelated. *Simmons v. Camden County Bd. of Educ.,* 757 F.2d 1187, 1189 (11th Cir. 1985). We construe the causal link element broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated., *citing Olmsted v. Taco Bell Corp.,* 141 F.3d 1457, 1460 (11th Cir. 1998) (quoting *EEOC v. Reichhold Chems., Inc.,* 988 F.2d 1564, 1571-72 (11th Cir. 1993)) (internal quotation marks omitted).

In this case, Plaintiff complained that she was being harassed and treated differently because of her pregnancy. Plaintiff also complained that Farmer, who was also pregnant, was being treated differently because of her pregnancy. Plaintiff first complained on November 13, 2009, in her e-mail to Watkins. (PL Ex. 9). After complaining, the decision was made to move Plaintiff's office to a storage closet, Plaintiff's pay was reduced, Plaintiff was instructed that she had to have zero errors when other employees were allowed 3%, Plaintiff's evaluation scores were lowered, Plaintiff was no longer allowed to perform editing duties, and Plaintiff was not informed that she had worked through her PIP in thirty days.  All of these adverse actions occurred from November 13, 2009 through April 2010. and  to management that he was being discriminated against based on his race.  These adverse job actions provide evidence of retaliatory animus to establish the causal link required to survive summary judgment on the claim.

In *Burlington Northern and Santa Fe Ry. Co. v. White*, the Supreme Court of

Page 81 of  85

the United States enlarged the reach of Title VII retaliation to include claims beyond those premised upon adverse employment actions:

> We conclude that the antiretaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace. We also conclude that the provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant. In the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from [opposing any practice made unlawful by Title VII]. *Id.*, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409 (2006) (emphasis added).

As the Eleventh Circuit has expressly recognized, the standards governing discrimination and retaliation claims are considerably different post-*Burlington*. *See Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) ("We therefore are persuaded that the adverse employment action standard previously applied in this circuit to Title VII retaliation claims is more stringent than the 'materially adverse' standard announced in *Burlington*."); *id.* ("We therefore conclude that not only was district court's ruling on Crawford's Title VII retaliation claim [premised upon an unfavorable performance review] wrong under our prior, narrower standard, but also that it most certainly is wrong under *Burlington*'s more liberal standard.").

Defendant's motion for summary judgment regarding Plaintiff's claims of Title VII retaliation is due to be denied.

### C.   DEFENDANT RETALIATED AGAINST PLAINTIFF IN VIOLATION OF FMLA

Under section 2615(a) of the FMLA, an employee may bring two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act; and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in an activity protected by the Act. *Strickland v. Water Works & Sewer Bd. of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001) (citations omitted).

In order to state a prima facie case, Plaintiff must show that: "(1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was casually related to a protected activity." *Walker*, 379 F.3d at 1252 (citing Strickland, 239 F.3d at 1207).

Under the FMLA an employee need not be currently exercising her rights orcurrently eligible for FMLA leave in order to be protected from retaliation. The FMLA makes it "unlawful for any employer to interfere with, restrain or deny the exercise of or the attempt to exercise, any right" provided under the FMLA. 29 U.S.C. § 2615(a)(1). The FMLA also protects employees and prospective employees even if the individual is not currently eligible or entitled to leave. See 29 C.F.R. § 825.220 (prohibiting employers from discriminating against employees or prospective employees who have previously used FMLA leave); see also *Potts v. Franklin Elec. Co.*, No. Civ. 05-443, 2006 WL 2474964, at *1 (E.D. Okla. 2006) (holding an employee who gave notice of expected FMLA leave could bring a retaliation claim

even though a triggering event never occurred). In Potts, the district court reasoned that "[i]f courts were to read the FMLA to allow employers to dismiss ineligible employees who give advance notice of their need for FMLA leave, it would open a large loophole in the law and undermine the plain language and purpose of the notice requirement in § 2612(e)(1)." 2006 WL 2474964, at *3. Similarly, the FMLA protects Plaintiff from retaliation, even though at the time of her request, she was not yet eligible or entitled to FMLA leave because she had not yet given birth. The question remains for the district court as to whether there is colorable evidence that Robinson, Watkins and/or Sample did in fact retaliate against plaintiff.

Because Plaintiff engaged in protected activity by discussing and applying for her maternity leave, she has alleged a valid cause of action for retaliation under the FMLA.

## IV.   CONCLUSION

Based on the above and foregoing, it is clear a reasonable jury could hear the evidence presented by Plaintiff and determine a question of fact exists as to Plaintiff's claims. The truth is not only obvious but simple. Plaintiff's pregnancy, FMLA leave and her complaints of discrimination were the factors which led to Defendant's adverse actions. As such, summary judgment is due to be denied by this Court.

Respectfully submitted this the **14**th day of **December, 2012**.

/s/ Cynthia Forman Wilkinson

CYNTHIA FORMAN WILKINSON
State Bar ID No.:  ASB-9950-L68C
Attorney for Plaintiff

**OF COUNSEL:**
**WILKINSON LAW FIRM, PC**
New South Federal Savings Building, Ste 811
215 North Richard Arrington Jr. Blvd.
Birmingham, Alabama 35203
Tel.:  (205) 250-7866
Fax:  (205) 250-7869
E-mail: wilkinsonfirm@bellsouth.net

## CERTIFICATE OF SERVICE

I hereby certify that on **December 14, 2012**, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

J. Richard Carrigan, Esq.
Katherine E. Reeves, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1819 Fifth Avenue North
Suite 1000
Birmingham, Alabama 35203

I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: None

s/Cynthia Forman Wilkinson
**WILKINSON LAW FIRM, PC**